**In re CABLE ONE CATV, a Ltd Partnership, Debtor.**

**Bankruptcy No. 91–12387–JEY.**

United States Bankruptcy Court, D. New Hampshire.

May 31, 1994.

William S. Gannon, Wadleigh, Starr, Peters, Dunn & Chiesa, Manchester, NH, for debtor and Community Services of Maine.

Roger B. Godwin, Andover, NH, Home Box Office, Inc., New York City, for Town of Andover.

Robert B. Kaplan, Frandzel & Share, San Francisco, CA, for Phoenix Leasing.

Geraldine B. Karonis, Asst. U.S. Trustee, Manchester, NH, for UST.

John A. Malmberg, Castaldo, Hanna & Malmberg, Concord, NH, for Midwest Corp.

Jacob A. Manheimer, Pierce, Atwood, Scribner, Allen, Smith & Lancaster, Portland, ME, for Berry, Dunn McNeil & Parker and Joseph V. O'Donnell.

J. Christopher Marshall, McLane, Graf, Raulerson & Middleton, Manchester, NH, for Jerrold Communications.

Nancy Michels, Michels & Michels, Londonderry, NH, Joseph V. O'Donnell, The Pilot Group, Portland, ME, for CEA, Inc.

Charles Platto, Brooks McNally Whittington Platto & Vitt, Norwich, VT, for Jerrold Communications.

Diane Puckhaber, Rogers & Puckhaber, Concord, NH, for Susan Lundborg.

John C. Ransmeier, Ransmeier & Spellman, Concord, NH, for Joseph V. O'Donnell.

Timothy P. Smith, Manchester, NH, for Joseph V. O'Donnell.

John M. Sullivan, Sulloway, Hollis & Soden, Concord, NH, for First Carolina Cable TV, 9 L.P.

James Walter Turner, Charleston, WV, for Anixter, Bros., Inc.

Dan Callaghan, Devine, Millimet & Branch, P.A., Manchester, NH, for Phoenix Leasing, Inc.

T. Calvin Wells, Jackson, MS, for Trilogy Communications, Inc.

Michael Winograd, Concord, NH, for Gilbert Engineering Co., Inc.

## MEMORANDUM OPINION

JAMES E. YACOS, Bankruptcy Judge.

This case is before the Court on remand from the United States District Court, entered April 22, 1993, in which the U.S. District Judge directed the determination by this Court of the following questions:

1. "[W]hether there was any evidence of collusion between First Carolina and the Trustee that would negate First Carolina's status as a purchaser 'in good faith' "?

2. "[W]hether First Carolina paid 'value' for the assets purchased"?

3. "[I]f the Bankruptcy Court determines First Carolina was not a 'good faith' purchaser and did not pay 'value,' it must determine whether it has the power to undo the sale. 'Implicit in this determination is the question whether ... the sale has become moot under Article III' of the U.S. Constitution. *In re Abbotts Dairies*, 788 F.2d [143] at 151 [ (3rd Cir.1986)."]

4. "[F]inally, if the Bankruptcy Court determines it has the power to undo the sale, it should exercise its equitable jurisdiction to determine whether to undo the sale or to pursue another remedy. *See Id.*"

### HISTORY OF PROCEEDING

On October 19, 1992, this Court entered an Order authorizing the sale of the assets of the debtor, Cable One CATV Limited Partnership, free and clear of liens to First Carolina Cable TV, L.P.[1] (hereinafter the "Sale Order") Ct.Doc. No. 144. On October 28, 1992 the debtor filed a motion to reconsider the Sale Order which was denied at a hearing on November 24, 1992. On December 2, 1992, the debtor appealed the Sale Order to the District Court and shortly thereafter filed a motion for stay pending appeal in this Court in an attempt to halt the closure of the sale until after the appeal was decided. At a hearing held on December 18, 1992 the Court denied the motion for stay pending appeal and ordered the parties "to proceed to consummate the sale as authorized and directed by the Order of the Court." Ct.Doc. 211.

Accordingly, the Trustee–Appellee filed a motion with the District Court to dismiss the pending appeal of the Sale Order as moot under 11 U.S.C. § 363(m). Section 363(m) states:

---

1. The motion, which was filed by the trustee, was properly noticed and a hearing was held on October 8, 1992. The debtor and Roger Godwin, an unsecured creditor, objected to the sale. Ct. Doc. Nos. 146, 151.

"The reversal or modification on appeal of an authorization ... of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal."

■ Under § 363(m), the Sale Order is final unless the Court determines that the buyer, First Carolina, was not a "good faith purchaser"[2]. Because the Bankruptcy Court did not make an explicit finding as to the good faith status of First Carolina at the sale hearing, the District Court has remanded the case to the Bankruptcy Court to make such a finding.

In response to this directive, the Court held a hearing during which the Debtor–Appellant completed its evidentiary showing. At the conclusion of the debtor's case the appellee, reserving the right to call additional witnesses, entered a motion for a directed verdict in its favor as to the answers to the first two questions posed by the remand. In response, the Court ordered the parties to submit additional legal memorandums and on November 5, 1993, the Court heard oral argument on the issues. The case was taken under advisement on December 6, 1993. In addition to the said hearings, the parties have extensively briefed the legal issues presented. Based on these presentations, the Court determines that the Trustee–Appellee's motion should be deemed granted and accordingly submits the following responses to the District Court's questions.

### REMAND ISSUES

■ The policy behind § 363(m) is to promote finality in judgments and encourage the obtaining of maximum value of assets notwithstanding the risks associated with bankruptcy sales. *In re Stadium Management Corp.*, 895 F.2d 845, 847 (1st Cir.1990); *In re Tri–Cran, Inc.*, 98 B.R. 609 (Bankr.D.Mass.

1989); *In re Sax*, 796 F.2d 994, 998 (7th Cir.1986). "Without the degree of finality provided by the stay requirement, purchasers are likely to demand a steep discount for investing in the property." *In re Sax*, 796 F.2d at 998. The purpose of the provision is "to overcome people's natural reluctance to deal with a bankrupt firm whether as purchaser or lender by assuring them that so long as they are relying in good faith on a bankruptcy judge's approval of the transaction they need not worry about their priority merely because some creditor is objecting to the transaction and is trying to get the district court or the court of appeals to reverse the bankruptcy judge". *Matter of EDC Holding Co.*, 676 F.2d 945, 947 (7th Cir.1982) (discussing parallel provision § 364(e) dealing with priority of good faith lenders). The question before this Court, is whether the buyer, First Carolina, is a good faith purchaser.

■ Although a definition for "good faith purchaser" can not be found in the Bankruptcy Code, courts have consistently defined the term as one who (1) purchases in good faith; (2) for value; and (3) without knowledge of adverse claims. *Greylock Glen Corp. v. Community Savings Bank*, 656 F.2d 1, 4 (1st Cir.1981); *In re Rock Industries Machinery Corp.*, 572 F.2d 1195 (7th Cir.1978); *Oakville Development Corp. v. F.D.I.C.*, 986 F.2d 611, 613 (1st Cir.1993). Good faith is a mixed question of law and fact. *In re Mark Bell Furniture Warehouse*, 992 F.2d 7 (1st Cir.1993). The instructions of the District Court on this remand implicitly embrace this definition.

QUESTION ONE: Whether there was any evidence of collusion between First Carolina and the Trustee that would negate First Carolina's status as a purchaser 'in good faith'?

■ The question before this Court is whether there was fraud or collusion be-

---

**2.** Under 363(m), a sale to a good faith purchaser which is approved by the Court is final and cannot be reversed unless the sale is stayed pending appeal. If a buyer acts in good faith, the Court cannot alter or change a consummated sale thus any appeal of the sale is moot and must

be dismissed. *In re Stadium Management Corp.*, 895 F.2d 845 (1st Cir.1990); *In re Mark Bell Furniture Warehouse*, 992 F.2d 7, 8 (1st Cir. 1993); *In re Charter Company v. Charter International Oil Co.*, 829 F.2d 1054 (11th Cir.1987).

tween First Carolina and Trustee that would negate First Carolina's status as a good faith purchaser[3]. The "good faith" of a buyer concerns integrity of conduct during the sales process. *In re Rock Industries, supra* at p. 1198. "Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *In re Rock Industries,* 572 F.2d at 1198; *In re Abbotts Dairies of Pa., Inc.,* 788 F.2d at 147; *In re Mark Bell Furniture Warehouse, Inc.,* 992 F.2d at 8 *citing In re Andy Frain Servs., Inc.,* 798 F.2d 1113, 1125 (7th Cir.1986); *Willemain v. Kivitz,* 764 F.2d 1019, 1023 (4th Cir.1985); *In re Bel Air Assocs., Ltd.,* 706 F.2d 301, 305 (10th Cir.1983).

■ The sum and substance of the debtor's claim is that First Carolina obtained a "grossly unfair advantage of other bidders" by their participation as an informed party in an otherwise flawed sales process. *In re Rock Industries, supra.* The debtor argues that the sales process was flawed because the Trustee lacked a general understanding of the cable industry and as a result was unable to effectively disseminate information about Cable One assets and follow up on expressions of interest by potential purchasers.

This again is not germane to the question presently before the Court[4]. More relevant is the debtor's argument that First Carolina had certain information concerning the value of the debtor's assets obtained from Susan Lundborg[5] in accordance to the terms of a non-compete agreement signed by Lundborg and C. David Smith, President of First Carolina parties on January 16, 1992[6]. The debtor argues First Carolina's use of the knowledge obtained from Susan Lundborg was in breach of the agreement. The debtor contends this factor, combined with the trustee's alleged incompetence, put First Carolina in a superior bargaining position to negotiate for Cable One assets.[7] The debtor also contends that First Carolina and Jerrold Communications, the primary unsecured creditor, entered into a secret deal whereby Jerrold agreed to support the sale to First Carolina in exchange for a return of inventory held by Cable One. All these alleged facts are said to have tainted First Carolina's acts and as a result negated their good faith status.

■ However, despite endless accusations of secret deals and collusion, the debtor has failed to introduce any direct evidence of unfair dealings, under-the-table negotiations, or selective information dissemination between First Carolina and the trustee to substantiate allegations of collusion. The fact

3. In the briefings, the debtor raised arguments relating to the trustee's alleged mismanagement in the marketing and negotiation of the sale of the debtor's assets. These issues are currently the subject of Adversary Proceeding No. 93–1037 before this Court. This proceeding was brought by the general partner of the debtor against the trustee, and also involves a third-party complaint by the trustee against Susan D. Lundborg, the sole owner of the corporate general partner. As set forth repeatedly during the evidentiary hearing and oral arguments, the Court reiterates and finds that all arguments relating to the trustee's alleged incompetence are not relevant to the issue of the good faith of First Carolina.

4. See footnote 3, *supra.*

5. Susan Lundborg is the owner and president of the general partner of the debtor, Cable One CATV Limited, Inc. She is owner of numerous other properties referred to generally as the Lundborg entities.

6. This agreement was never approved or authorized by the Court.

7. During oral argument, the attorney for the debtor argued that First Carolina used "confidential and proprietary information, insights from the principal that was made available pursuant to a contract that was entered into to negotiate an arm's length sale, which [was] then unilaterally and willfully breached [by First Carolina's participation in the trustee's auction sale]". (Transcript, November 5, 1993, p. 35, continued hearing on remand; "Debtor–Appellant's Position Statement Regarding Federal District Court's Remand," Ct.Doc. No. 267). However, during testimony, Susan Lundborg conceded that all the information she had given to First Carolina was in the trustee's possession to dispense to potential buyers. (Transcript August 17, 1993, p. 215, status hearing on appeal of sale docketed September 2, 1993). Her complaint was that the trustee did not do so. She also surmised that First Carolina must have received their information from her and not the trustee based on the amount of time the trustee testified he spent negotiating with First Carolina. (August 17 hearing, O'Donnell testimony, p. 127–129, Lundborg testimony, p. 216).

that Susan Lundborg may have disclosed information to First Carolina regarding the debtor's assets in accordance to an agreement between the two parties is not evidence of collusion between First Carolina and the trustee [8]. Further, the debtor's "proof" of a secret deal between Jerrold and First Carolina is no more than a recitation of her personal impressions of their conduct at a meeting where Ms. Lundborg was not even present. Transcript, August 17, 1992, Status Hearing on Appeal of Sale, Lundborg Testimony, p. 184–186, Docketed September 2, 1993.

■ Although the Court does not at this time make a finding of the soundness of the trustee's sales procedures, it does note that prospective parties were properly noticed of the October 19 hearing and, if attentive, were aware of the pending sale of Cable One assets to First Carolina. The fact that the trustee allegedly may not have done all he could have done to bring the potential bidders to the table has no bearing on the good faith status of First Carolina. As noted above, that contention is at the heart of the separate adversary proceeding currently being pursued against the trustee in this Court.

■ Even if First Carolina knew it was participating in what may have been a procedurally defective sales process that fact by itself would not negate their good faith standing. It has been held that even if a buyer knows a sale is procedurally defective this does preclude it from being a good faith purchaser. *In re Rock Industries,* 572 F.2d at 1199; *Oakville Development Corp. v. F.D.I.C.,* 986 F.2d 611 (1st Cir.1993).

In sum, the Court finds the debtor has failed to introduce any convincing evidence of collusion between the trustee and First Carolina to support allegations that First Carolina did not purchase the debtor's assets in good faith. The first question posed on remand accordingly is answered in the negative.

> QUESTION TWO: Whether First Carolina paid value for the assets purchased?

The debtor contends First Carolina did not pay "value" for the Cable One assets because the $1.25 million paid was not at least 75 per cent of the value of the assets. *Greylock Glen Corp. v. Community Savings Bank,* 656 F.2d 1, 4 (1st Cir.1981) ("In the context of bankruptcy-related sales, a buyer is generally deemed to have purchased for 'value' when he pays at least 75 per cent of the appraised value of the assets") *citing In re Rock Industries,* 572 F.2d 1195 n. 1 (3rd Cir.1978) (dicta). The debtor argues that the value of the assets, as she testified to and as supported by the recent sale of a comparable system, is between $2 million and $2.5 million. (*Transcript,* November 5, 1993, p. 29, continued hearing on remand, docketed November 17, 1993).

At the time of the October 19 hearing, there was no appraisal before the Court of the value of the Cable One assets although at the time of the hearing the trustee had in his possession an appraisal from Gregory Ainsworth of Daniels & Associates (hereinafter the "Daniels appraisal") which he referred to in his motion for sale of assets (Ct.Doc. No. 125) and also made reference to the same during the course of the hearing. (Oct. 8, 1992 transcript, p. 26). Also before the Court on that date was the Phoenix Disclosure Statement and Plan which valued the

---

8. On the contrary, it is arguable that Ms. Lundborg did not have the power to bind the estate to the terms of her agreement with First Carolina without Court authorization. The agreement of January 16, 1992 (Debtor's Exhibit No. 1) with First Carolina was executed by Susan Lundborg acting as president of her non-debtor entities, Northern One, CATV, Inc. and Community Cable Services of Maine, Inc., in which she stated that she would provide information necessary for First Carolina's analysis about purchasing the debtor-partnership but with the following proviso:

"I will do so with the understanding that 1) all information is completely confidential, 2) you agree to negotiate only with me regarding this sale, and 3) you agree not to compete with any cable franchise held by any of my entities until such agreement may be modified by a further understanding or for one year, whichever comes first."

Without full disclosure and approval beforehand, such a power could in effect limit competitive bidding for a debtor's assets in an inappropriate manner.

debtor's assets at $1,019,875[9]. On August 17, 1993 (hereinafter the "Remand hearing") the Daniels appraisal was entered as an exhibit (Ct.Exh. No. 3) and the Court took testimony from Mr. Gregory Ainsworth who prepared the document.

Also at the October 8, 1992 sale hearing, the trustee advised the Court that he had an expression of interest from two other cable companies, i.e., Community Cable of New Hampshire and another company referred to only as "Pegasus" of Pennsylvania, under which Pegasus had previously submitted a letter of intent to purchase for $1.2 million dollars but had not followed up with a formal offer. Community Cable of New Hampshire indicated a possible offer at one point of $1,100,000 but also did not follow up with a formal offer.[10] (Transcript, October 8, 1992, pp. 31–34; Transcript, August 17, 1993, pp. 56–60.)

At both the Sale hearing and the Remand hearing, the debtor has continually questioned and objected to the validity of the Daniels appraisal, contending the value of the Cable One assets were as high as $2.7 million. The debtor bases the higher valuation of Cable One not on a formal appraisal of the assets but by comparison of the value of recent sales of other cable systems across the country and in New Hampshire[11].

As an initial matter, the Court notes values of such great discrepancy in excess over a pending purchase offer, as testified to by Ms. Lundborg, usually have a way of being discovered by others in the industry. Cf. Wille-
main v. Kivitz, 764 F.2d 1019, 1023 n. 7 (4th Cir.1985) ("a favorable appraisal without a corresponding actual purchaser cannot be allowed to stymie a Bankruptcy Court as it attempts to decide expeditiously matters before it."); In re Vanguard Oil & Service Co., Inc., 88 B.R. 576 (E.D.N.Y.1988).

■ However, the Court places lesser weight upon historical sales data coming from sales in the federally-regulated cable industry due to constant recent changes in that regulatory environment. The value of even an arguably comparable cable system six months ago is not indicative of the value of a different system today[12]. Furthermore, each system is unique, with strengths and problems associated with the region where it is located. The geography and population of the cable region served makes each system unique and any comparison difficult in terms of all the variables.

The value of a cable system in Nevada or California, or even a different geographical and different populated area of New Hampshire, accordingly is not determinative of value of the Cable One assets. This is especially true in the present context in which the system had been in the bankruptcy court since August 12, 1991 and was known to be available for acquisition since the debtor itself was never able to come forward with a reorganization plan.[13]

■ During the Remand hearing, the Court received extensive testimony of Gregory Ainsworth, who prepared the Daniels ap-

---

9. Phoenix Leasing Incorporated is a secured creditor of the debtor. The Phoenix Second Amended Disclosure Statement dated August 6, 1992 placed a market value of the debtor's assets at $1,019,875 based upon an appraisal it commissioned. (Ct.Doc. 113). The Disclosure Statement was approved by the Court on August 7, 1992. (Ct.Doc. No. 115).

10. For clarity from the transcripts it should be noted that Community Cable Company of New Hampshire is also referred alternatively as "Laconia" Cable Company.

11. The debtor also made a contention that the Phoenix appraisal did not take into account the value of the nine unbuilt franchises. However, the First Carolina sale did not include the nine unbuilt franchises.

12. The uncertainty of massive threatened changes in the federal regulatory laws dealing with cable systems was a factor "in the air" at the time of the sale here in question.

13. One of Ms. Lundborg's other cable companies, Community Cable of Maine, Inc., purported to file a plan of reorganization on December 4, 1992 (Court Doc. No. 185). Aside from the question of whether that entity had any standing to file a plan of reorganization in this case the effort was rendered moot by the sale and by the denial of stay. A review of that sketchy document illustrates my view then, and today, that it was simply an exercise in pleading with no substance behind it, designed only to block consideration of the sale offer actually moving forward in the Court proceedings.

praisal. The Court found his valuations well-grounded and persuasive. Thus, the Court now has before it the Daniels appraisal and the Phoenix appraisal, which both value the debtor's assets below the sale price paid by First Carolina. Opposed to this is Ms. Lundborg's testimony which values the debtor's assets significantly above First Carolina's purchase price.

In my view the Daniels and Phoenix appraisals carry far more weight than Ms. Lundborg's view of the value of the assets. However, even if I were to accept her numbers, which I do not, I still would find as a matter of law that the purchaser paid "value" for the assets notwithstanding the fact that the purchase price would then have been shown, as a result of this remand hearing, to be below 75 percent of Ms. Lundborg's valuation. The Court has extensively reviewed the case law on this point, and although many cases have referred in dicta to a "75 percent rule" regarding bankruptcy sales, the Court has not found one case in the § 363(m) context which has overturned a bankruptcy sale exclusively for insufficient value paid. Even in the context of the direct merits of appeal from a bankruptcy sale order the references to "75 percent" are far from being a "rule" in the actual decisions.

The origin of the "75 percent" reference in the First Circuit is a case, *Greylock Glen Corp. v. Community Savings Bank*, 656 F.2d 1 (1st Cir.1981) which cited a footnote of a Seventh Circuit case, *In re Rock Industries*, 572 F.2d 1195, 1197 n. 1 (7th Cir.1978), for the proposition that a purchaser pays value when the price paid is at least 75 percent of the appraised value of the assets. However, whether or not value was paid by the purchaser was not even an issue in *Rock Industries*[14]. The discussion in *Rock Industries* focused entirely on the propriety of the successful purchaser, Gabriel, who had participated in a private pre-auction conference with the judge and the trustee, who had obtained information on bidding for the debtor's assets which no other party knew until the day of the auction. 572 F.2d at 1197. At the auction the competing bidder requested a postponement of the sale to allow time to prepare an adequate bid with the new information received at the hearing. The judge refused to postpone the hearing and accepted Gabriel's bid. Had Gabriel withdrawn its bid, the proceeding would have been postponed and the competing bidder would have had the opportunity to submit a competitive bid. Gabriel refused. The issue before the Court was not whether adequate value was paid but whether Gabriel's actions qualified as "flagrant misconduct" that would negate good faith purchaser status. *Id.*

The Seventh Circuit Court affirmed the District Court's judgment that the purchaser did act in good faith. The Court went on to note that although the ultimate effect of Gabriel's actions were detrimental to the competing bidder's ability to submit a comparable bid, the Appellant's dispute was not with the Gabriel but with the judge who denied the motion for postponement. The Court further held that Gabriel's knowledge of the alleged irregularities in the sale procedure did not negate good faith purchaser status. *Id.* at 1199 (otherwise "no purchaser who attended a confirmation hearing at which objections were raised to the order confirming sale could ever be deemed a 'good faith purchaser' ").

Likewise, the *Greylock* case did not turn on inadequate value paid by the purchaser. In the *Greylock* case there were two appraisals before the Court, one for $2.5 million and one for $7.3 million. The Court rejected the higher appraisal based on the current market for the type of assets in question and held that the $2.7 million paid by the bank for the property constituted value[15]. Thus, although the Court stated "a buyer is generally deemed to have purchased for 'value' when

---

14. *In re Rock Industries*, 572 F.2d at 1197 ("It is not disputed that Gabriel purchased the bankrupt's assets for value.") I note also that the Seventh Circuit does not adhere to a rigid "75 percent" rule." *In re Chicago, Milwaukee, St. Paul & Pacific R.R.*, 799 F.2d 317, 329–30 (7th Cir.1986).

15. The *Greylock* case is similar to this case in that the higher appraisal value, although perhaps reflective of the potential of the property in the best of times, was not reflective of the actual value of the assets on the date of the bankruptcy sale.

he pays at least 75 per cent of the appraised value of the assets," the only appraisal accepted by the Court valued the assets at well below the actual sale price. Lower courts in subsequent First Circuit cases have not embraced a hard and fast "75 percent rule." *In re Vanguard Oil & Service Co., Inc.*, 88 B.R. 576 (E.D.N.Y.1988) ("appellant's argument that a purchaser pays 'value' only if it pays at least seventy-five percent of the appraised value of the sold assets is unpersuasive."); *compare In re Tri–Cran, Inc.*, 98 B.R. 609 (Bankr.D.Mass.1989) (although purchaser paid 75 percent of value of debtor's assets, Court found the buyer was not a good faith purchaser due to misrepresentations and concealment from Court).

█ There is no question that bidders participate in the bankruptcy sale process in the hopes of obtaining a bargain price for the debtor's assets. Astute purchasers invest significant time and money in the investigation of the bankrupt's title and assets in an attempt to establish at what level they are willing to buy. They invest the time and money largely because they know that in a bankruptcy court when the hammer falls the deal is closed and final unless a party not only appeals but also obtains a stay. The fact that a good faith purchaser walks away from the court with a bargain does not ipso facto make the sale a bad deal and the buyer a bad faith purchaser.

The bankruptcy court's reputation for efficient and final sales, stemming from the unique mootness provision of § 363(m) of the Code, ultimately benefits all bankrupt's estates. The search for a bargain keeps the players in the game. Simple economics supports the proposition that the more bidders that are involved, the more likely the Court is to maximize the value of the assets. While some cases do justify setting "upset prices" based on appraised value of assets, such cases are relatively uncomplicated and usually deal with discrete assets having market values easily obtained from relevant market data. In such situations a sale process with upset prices will not usually discourage competitive bidding. The situation is very different when selling a more complicated package of operational assets, as is true here, and rigid application of a fixed upset price can discourage bidders from investing the time and money to come in and bid should their own examination indicate the appraised value is unrealistically high.

█ For these reasons, there is a strong policy of finality in bankruptcy sales.[16] The Court acknowledges the countervailing policy embodied in § 363(m) requirement of good faith participation in the process. However, this Court does not accept the proposition that the good faith of a purchaser can be destroyed solely due to the failure of the purchase price to be a minimum percentage of appraised value nor does the Court believe this is the present state of the law in the First Circuit or any other Circuit. Although *generally* a buyer is deemed to have purchased for value if the price paid is 75 percent of the appraised value of the assets, that general proposition in my judgment does not decide the meaning of the word "value" for all purposes and for all situations involved in the § 363(m) sale finality context[17]. Absent a showing of fraud or collusion, this Court will uphold a bankruptcy sale if the consideration paid is reasonable under the facts and circumstances of the case. Here, the value paid was reasonable in that context and I

16. "If parties are to be encouraged to bid at judicial sales there must be stability and a time must come when a fair bid is accepted and the proceedings are ended." *Cedar Island Builders v. South Cty. Sand & Gravel*, 151 B.R. 298, 302 (Bankr.D.Conn.1993) *quoting In re Webcor*, 392 F.2d 893, 899 (7th Cir.), *cert. denied*, 393 U.S. 837, 89 S.Ct. 113, 21 L.Ed.2d 107 (1968).

17. Indeed, if the debtor's contention here were to become the law the efficiency of § 363(m) would effectively be eviscerated. This is so because essentially all of the contentions the debtor is now making regarding the meaning of "value" for determination of good faith purchaser status are identical to the issues raised by the debtor on the merits in the appeal. *See* Statement of Issues to be Presented on Appeal of Bankruptcy Court's Order Authorizing Sale Free and Clear of Liens, filed December 14, 1992, Court Doc. No. 199. If an appeal is taken from a bankruptcy sale order because insufficient value was obtained the appellant should not be entitled to get a "free appeal" stopping the sale, without a stay protecting the estate and the buyer, by just recasting the merits of the appeal in terms of the good faith of the buyer.

therefore conclude that First Carolina did pay value within the meaning of § 363(m) of the Bankruptcy Code.

For the foregoing reasons, the Court finds First Carolina is a good faith purchaser. This determination, based on answers to the first two questions posed by the remand, renders unnecessary answers to the third and fourth questions. An appropriate Report on Remand to that effect will be entered separately this date.