OLD COLD, LLC, f/k/a Tempnology, LLC, Debtor.

Mission Product Holdings, Inc., Appellant,

v.

Old Cold, LLC and Schleicher & Stebbins Hotels, L.L.C., Appellees.

BAP NO. NH 15-069
Bankruptcy Case No. 15-11400-JMD

United States Bankruptcy Appellate Panel of the First Circuit.

October 25, 2016

Robert J. Keach, Esq., and Michael A. Siedband, Esq., on brief for Appellant.

Daniel W. Sklar, Esq., and Christopher Desiderio, Esq., on brief for Appellee, Old Cold, LLC.

Christopher M. Candon, Esq., on brief for Appellee, Schleicher & Stebbins Hotels, L.L.C.

Before Lamoutte, Hoffman, and Cary, United States Bankruptcy Appellate Panel Judges.

Lamoutte, U.S. Bankruptcy Appellate Panel Judge.

On December 18, 2015, the bankruptcy court entered an order (the "Sale Order") approving the sale of substantially all of the assets of the debtor, Old Cold, LLC, formerly known as Tempnology, LLC (the "Debtor"),[1] to Schleicher & Stebbins Hotels, L.L.C. ("S&S"). The bankruptcy court's approval of the sale was the culmination of a process that took place over the course of several months under the supervision of the bankruptcy court, and with input from the U.S. Trustee and an independent examiner, who was appointed to oversee the sale process because it involved a proposed insider transaction and a credit bid under § 363(k).[2] Mission Prod-

---

[1] The sale terms required the Debtor to change its name upon the closing of the sale. The sale closed on December 18, 2015, and on December 21, 2015, the Debtor filed a notice with the New Hampshire Secretary of State changing its name from Tempnology, LLC to Old Cold, LLC. Thereafter, the Debtor filed with the bankruptcy court a motion to amend its case caption to reflect its new legal name, which the bankruptcy court granted.

[2] Unless expressly stated otherwise, all references to "Bankruptcy Code" or to specific statutory sections shall be to the Bankruptcy Reform Act of 1978, as amended, 11 U.S.C. §§ 101, et seq. All references to "Bankruptcy

uct Holdings, Inc. ("Mission"), an unsuccessful bidder for the Debtor's assets and a counterparty to one of the Debtor's rejected executory contracts, appealed the Sale Order, challenging the bankruptcy court's approval of the sale and its finding that S&S was a good faith purchaser.

For the reasons set forth below, we **AFFIRM.**

## BACKGROUND

### I. The Parties

Prior to the sale, the Debtor was a Portsmouth, New Hampshire based material innovation company that, among other things, developed chemical-free cooling fabrics under the Coolcore brand for use in consumer products. Kevin McCarthy ("McCarthy") was the Debtor's chief executive officer and Richard Ferdinand ("Ferdinand") was its chief financial officer.

S&S was the Debtor's majority equity owner, largest unsecured creditor, postpetition debtor-in-possession financier, stalking horse bidder, and successful purchaser. S&S originally invested in Frigid Fabrics LLC that, in turn, invested in and was a member of the Debtor. Thus, S&S had an indirect ownership interest in the Debtor. The principals of S&S, Mark Schleicher ("Schleicher") and Mark Stebbins ("Stebbins"), were, until July 2015, members of the Debtor's management committee.

Mission was the counterparty to a Co-Marketing and Distribution Agreement (the "Mission Agreement") that the Debtor subsequently rejected, and the only other qualified bidder for the Debtor's assets.

### II. Pre-Bankruptcy Events

The Debtor was formed in 2011. In 2012, the Debtor and Mission executed the Mission Agreement, whereby the Debtor granted Mission exclusive distribution rights to certain of the Debtor's products within the United States. The Mission Agreement also gave Mission a non-exclusive, irrevocable, royalty-free, perpetual, worldwide, fully-transferrable license to, among other things, freely exploit certain of the Debtor's intellectual property.

Despite some level of sales, the Debtor remained unprofitable and plagued with losses. To combat its liquidity problems, the Debtor sought financing. In the spring of 2013, the Debtor obtained a secured line of credit from People's United Bank (the "LOC") with a credit limit of approximately $350,000.

The Debtor also borrowed money from S&S. It executed in favor of S&S a Commercial Term Note dated August 15, 2013, in the original principal amount of up to $6,000,000, as amended by a First Allonge to Commercial Term Note dated March 25, 2015 ("Term Note"). S&S loaned millions of dollars to the Debtor under the Term Note on an unsecured basis, but at some point it concluded it could no longer remain an unsecured lender.

In the spring of 2014, S&S acquired the LOC, along with People's United Bank's first position security interest in the Debtor's assets and the loan documents under which it could make loans to the Debtor on a secured basis. S&S then increased the LOC loan limit from $350,000 to $4,000,000, and rolled some of its unsecured debt into the secured LOC.

The Debtor's relationship with Mission also deteriorated in 2014, with both parties asserting material breaches of the Mission Agreement. After both parties attempted to terminate the Mission Agreement, they submitted the matter for a two-phase arbitration. On June 5, 2015, the arbitrator

Rule" shall be to the Federal Rules of Bankruptcy Procedure.

issued a Partial Final Award, determining the Debtor's termination for cause was ineffective and that the Mission Agreement remained in full force and effect during a two-year, wind down period. The remainder of the arbitration was stayed by the Debtor's bankruptcy.

In March 2015, the Debtor's management committee accepted a proposal by S&S to convert a portion of S&S' remaining unsecured debt to equity interests in the Debtor.[3] As a result of this conversion of debt to equity, as well as S&S' existing indirect ownership interest in the Debtor through Frigid Fabrics LLC, S&S became the majority owner of the Debtor.

By July 2015, the Debtor's financial situation had not improved, and it became apparent that a workout between S&S and the Debtor would be necessary. On July 13, 2015, the Debtor's management committee met with Stebbins to discuss the Debtor's financial status and the possible terms of a forbearance agreement for S&S' secured loans. Two days later, both Stebbins and Schleicher resigned from the Debtor's management committee, and were replaced by McCarthy and Ferdinand.

On July 16, 2015, S&S issued the Debtor a notice of default for failure to make payments on the LOC. Thereafter, S&S and the Debtor negotiated the terms of a forbearance agreement, which provided for an additional $1,400,000 in secured financing through September 1, 2015, on the condition that the Debtor file for bankruptcy and seek to sell substantially all of its assets pursuant to § 363.

In the meantime, in July 2015, the Debtor, without any involvement from anyone at S&S, engaged Phoenix Capital Resources ("Phoenix") as its investment banker to assess the Debtor's options, with Vincent Colistra ("Colistra") of Phoenix serving as lead investment banker. Colistra, determining that a sale of the Debtor's assets was necessary, developed a sales and marketing strategy for the Debtor's business. In August 2015, Phoenix, without direction from the Debtor, contacted S&S to commence sale negotiations after five other potential buyers declined to do so. Neither McCarthy nor Ferdinand was involved in the sale negotiations with S&S, relying instead on counsel from Nixon Peabody LLP to negotiate the agreement on the Debtor's behalf. S&S' counsel, Christopher Candon, negotiated on S&S' behalf.

In the original Asset Purchase Agreement dated September 1, 2015, S&S bid $6,950,000, the vast majority of which would be paid by a credit bid in the amount of S&S' secured loan. Ferdinand testified that the original Asset Purchase Agreement embodied terms that were initially discussed at the July 13, 2015 meeting between S&S and the Debtor. All witnesses testified, however, it was Phoenix that approached S&S regarding the possibility of S&S entering into an agreement to purchase the Debtor's assets in a bankruptcy sale, thereby assuming the role of "stalking horse," and that the sale negotiations were completed by counsel.

All witnesses testified they expected the ultimate purchaser would be S&S, but understood the sale would be to the highest bidder and subject to bankruptcy court approval in accordance with § 363. Stebbins testified he wanted the proposed sale to take place as quickly as possible, but deferred to Phoenix regarding how much marketing was needed. He also testified S&S pursued this transaction because he and Schleicher always believed in the

---

3. The Debtor contends it borrowed $5,374,308 under the Term Note, and a por-

tion of this debt ($3,500,000) was converted from debt to equity interests in the Debtor.

Debtor and its product, but felt a restructuring of the Debtor's obligations—especially the Mission Agreement—was necessary before S&S could become involved.

## III. The Bankruptcy Case

### A. Procedural History

On September 1, 2015, the Debtor filed a chapter 11 petition. On Schedule D-Creditors Holding Secured Claims, the Debtor listed S&S as holding a secured claim in the amount of $5,550,000 for loans made between August 28, 2014, and August 24, 2015. The Debtor also filed a motion seeking authority to obtain post-petition debtor-in-possession financing from S&S and to use S&S' cash collateral ("DIP Motion").

On September 2, 2015, the Debtor filed a motion seeking, among other things, an order approving procedures in connection with, and authorizing the sale of, substantially all of the Debtor's assets free and clear of liens, claims, encumbrances, and other interests (the "Sale Motion"), and a motion to reject certain executory contracts, including the Mission Agreement (the "Rejection Motion"). By the Sale Motion, the Debtor proposed to sell substantially all of its assets to S&S in accordance with the Asset Purchase Agreement, subject to an approved sale process and higher and better bids that would be solicited through the sale process and auction. The proposed purchase price under the Asset Purchase Agreement was $6,950,000, consisting of S&S' credit bid of $6,850,000, plus $100,000 of the Debtor's liabilities to be assumed by S&S.

On September 4, 2015, the bankruptcy court issued an order granting the DIP Motion on an interim basis, authorizing the

Debtor to obtain post-petition financing from S&S up to an aggregate of $500,000 (the "DIP Facility").[4] On September 9, 2015, S&S advanced $250,000 to the Debtor under the DIP Facility. On September 24, 2015, the bankruptcy court entered a second order approving the DIP Facility on an interim basis.

On September 11, 2015, Mission filed an objection to the Rejection Motion, the Sale Motion, and the DIP Motion, in which it indicated it was electing to retain rights under the Mission Agreement pursuant to § 365(n). Mission argued, among other things, that the bankruptcy court should deny the Sale Motion and DIP Motion to the extent they requested authority for S&S to credit bid its claims, arguing there had been no determination as to the validity or extent of S&S' security interest. It also argued that the Sale Motion impermissibly sought to use § 363 to sell the Debtor's assets free and clear of Mission's rights as reserved pursuant to its election under § 365(n), and the sale process was "being driven by S&S," who was an insider of the Debtor, as well as the Debtor's major secured creditor and the proposed post-petition lender.

On September 14, 2015, the U.S. Trustee filed a motion seeking an order converting the case to chapter 7 or authorizing the appointment of a trustee or examiner as an independent fiduciary to undertake the administration, investigation, and/or liquidation of the Debtor's estate. The next day, Mission also filed a motion seeking the appointment of a trustee or examiner, arguing that such appointment would allow "for a thorough, independent, and expeditious examination to be made into serious allegations," and would "allow for the timely and cost-ef-

---

4. The order also included a "carve-out" provision, providing that up to $400,000 of S&S' collateral could be used to pay allowed administrative expenses and unpaid professional fees.

fective investigation of those issues as well as any other misconduct by the Debtor and its insiders during and before the Petition Date."

On September 16, 2015, the U.S. Trustee filed an objection to the Sale Motion, in which he reasserted his position that cause existed for the appointment of an independent fiduciary to evaluate the proposed insider sale.

On September 18, 2015, the bankruptcy court entered an order directing the U.S. Trustee to appoint an examiner, and on September 24, 2015, the bankruptcy court approved the U.S. Trustee's request to appoint Michael Askenaizer as examiner (the "Examiner") to oversee the proposed sale process. The Examiner filed an interim report on September 30, 2015.

On October 2, 2015, the bankruptcy court held a hearing on several matters, including the Sale Motion and the Rejection Motion. At the hearing, S&S agreed to lower the proposed purchase price under the Asset Purchase Agreement to $1,050,000, credit bidding $750,000 in post-petition financing extended to the Debtor under the DIP Facility (the "DIP Financing"), and assuming approximately $300,000 in liabilities, consisting of approximately $130,000 in pre-petition accounts payable incurred within 60 days of the petition date and approximately $150,000 in cure costs related to certain contracts the Debtor wished to assume. Stebbins testified that S&S considered its agreement to lower its bid to be a concession in the hope of avoiding a fight over its credit bidding rights, but that S&S always intended to credit bid its pre-petition debt if necessary. Moreover, notwithstanding the amount of the DIP Financing embodied in the stalking horse bid, both Ferdinand and Stebbins testified S&S had only advanced $250,000 in DIP Financing as of the date of the bid.

On October 8, 2015, the bankruptcy court entered an order approving procedures in connection with the sale of the Debtor's assets, and approving S&S as the stalking horse bidder ("Sales Procedure Order"). It also allowed S&S to credit bid, providing:

> [S&S] is hereby granted the right to credit bid up to and including the post-petition amounts loaned to the Debtor under this Court's Post-Petition Financing and Cash Collateral Orders as of the Auction Date and ... to credit bid up to an additional $5,650,000 (the amount of [S&S]'s claim listed on the Debtor's Schedule D, plus accrued interest as of the Petition Date[ ] ) on the Assets.

The bankruptcy court set a deadline of November 2, 2015, for any other bids, an auction date of November 5, 2015, if other bids were received, a deadline of November 12, 2015, for any party to object to the sale, and a hearing date of November 18, 2015, to consider the proposed sale. In a separate order, the bankruptcy court granted the Rejection Motion, permitting the Debtor to reject the Mission Agreement subject to Mission's election to preserve its rights under § 365(n). Mission did not appeal either order.

On October 9, 2015, the bankruptcy court entered a third order relating to the DIP Facility ("Third Interim DIP Order"), authorizing the Debtor "to obtain credit and incur debt ... up to the aggregate amount of $750,000 ..." from S&S. The order also provided as follows:

> Pursuant to Section 363(k) of the Bankruptcy Code, the Lender is hereby granted the right to credit bid up to and including the post-petition amounts loaned to the Debtor under the Interim Order and this Order as of the Auction Date and Lender reserves the right to credit bid up to an additional $5,650,000 (the amount of the Lender's claim listed

on the Debtor's Schedule D, plus accrued interest as of the Petition Date) on the sale of substantially all of the Debtor's assets. Any challenge to the Lender's additional credit bid at the Auction must be raised on or before November 12, 2015 at 5:00 p.m.; provided, however, that the rights of any subsequently appointed Chapter 11 trustee, Chapter 7 Trustee or Examiner with expanded powers (if any is appointed), to examine, contest or recover payment of the secured prepetition claim being credit bid as the "additional credit bid" are preserved.

On October 29, 2015, one week before the scheduled auction, S&S advanced an additional $500,000 to the Debtor in DIP Financing, as authorized by the Third Interim DIP Order.

On November 2, 2015, Mission made a timely, qualified, all-cash bid of $1,300,000 to purchase the Debtor's assets.

On November 12, 2015, the Debtor filed a supplement to its DIP Motion, seeking to increase the total credit available under the DIP Facility from $1,300,000 to $1,450,000 to facilitate the closing of the sale. No party filed an opposition to the supplemental motion. On December 2, 2015, the bankruptcy court issued an order authorizing the Debtor "to obtain credit and incur debt … up to the aggregate amount of $1,450,000 …" upon certain terms and conditions set forth therein (the "Final DIP Order").

### B. Marketing Efforts for the Sale of the Debtor's Assets

Following the entry of the Sales Procedure Order, Phoenix continued its marketing efforts by sending teaser materials to 164 potential buyers, including liquidators, branding experts, apparel and textile companies, medical businesses, and hedge funds. Despite Phoenix's marketing efforts, other than S&S, only four parties signed nondisclosure agreements and gained access to the data room for the review of confidential information, and only Mission submitted a bid that was higher than S&S' stalking horse bid.

At the Sale Hearing, described herein, Colistra and McCarthy testified that, as part of this process, the Debtor provided Phoenix the names of businesses Phoenix should not contact in connection with the proposed sale. The list consisted of major existing or prospective customers even though Colistra testified major customers are often the most active bidders in sales pursuant to § 363. McCarthy maintained he did not want Phoenix to contact certain customers because the Debtor's size made it reliant on every order and he did not want to raise concerns about the Debtor's ability to fulfill orders. Notwithstanding the lack of direct marketing to customers, a press release regarding the sale was transmitted to all customers, distributors, and other "key international players." Also at the Sale Hearing, Colistra testified Phoenix followed its normal sales and marketing process and, given Colistra's experience with sales both in and out of bankruptcy, he opined that an additional 60 days of marketing and due diligence would not have yielded a different result in light of the responses Phoenix received.

### C. The Auction

On November 5, 2015, the Debtor conducted the auction (the "Auction") at the offices of its counsel, Nixon Peabody LLP. The Debtor and its professionals (counsel and investment banker), the Examiner and his counsel, a representative of the U.S. Trustee, Mission and its counsel, and S&S and its counsel attended the Auction. Only S&S and Mission participated as bidders at the Auction.

At the outset of the Auction, the Debtor's counsel announced the general framework of the Auction procedures and informed parties that "[n]egotiations may be conducted off the record." No party objected to the procedures outlined by the Debtor's counsel. The Debtor made the following representations regarding the state of its assets and liabilities: (1) S&S had loaned the Debtor $750,000 under the DIP Facility; (2) the Debtor was holding cash in the amount of $600,000; (3) the Debtor had accounts receivable in the amount of $100,000; (4) the Debtor had inventory of $1,200,000 at cost consisting almost entirely of finished product with a sales margin of at least 20%; (5) the Debtor had post-petition accounts payable of approximately $350,000; and (6) the "carve-out" for the Debtor's professionals under the DIP Facility totaled $400,000. Notably, under the asset purchase agreements signed by S&S and Mission, the Debtor's cash and cash equivalents were included as acquired assets.

In light of Mission's qualified bid of $1,300,000 in cash, S&S opened bidding with a bid of $1,400,000, which included a pre-petition credit bid. The Debtor immediately indicated it was accepting S&S' bid as superior to Mission's $1,300,000 cash bid. Mission, protesting S&S' credit bid of pre-petition debt and reserving the right to return to its original bid, increased its offer to $1,500,000, consisting of its original cash bid of $1,300,000, plus $200,000 of the Debtor's cash and cash equivalents to be excluded from the acquired assets and left in the estate.

As bidding continued, the Debtor, in response to Mission's bidding with respect to the Debtor's assets (i.e. agreeing to exclude certain assets from the assets to be acquired and leave them in the estate), including its accounts receivable and inventory, announced that for purposes of the Auction the value of the accounts receivable would be reduced from $100,000 to $80,000, and the value of the inventory would be reduced from $1,200,000 to a liquidation value of $120,000. Colistra testified this was done when he realized it was not appropriate to utilize "book value" in this context for these assets. Mission did not object to these valuations and both Mission and S&S used them in subsequent bids.

After several more rounds of bidding, Mission submitted its final bid, which totaled $2,600,000 (the "Mission Final Bid"), consisting of the following:

(1) $1,800,000 in cash paid by Mission;

(2) $600,000 of the Debtor's cash to be excluded from acquired assets and left in the estate;

(3) $80,000 of the Debtor's accounts receivable to be excluded from acquired assets and left in the estate; and

(4) $120,000 of the Debtor's inventory to be excluded from acquired assets and left in the estate.

The Debtor accepted the Mission Final Bid as being higher than the previous S&S bid.

Following the Mission Final Bid, S&S made its final bid totaling $2,700,000 (the "S&S Final Bid") consisting of the following:

(1) $750,000 credit bid of DIP Financing;

(2) $657,000 pre-petition unsecured debt which S&S would assume in the amounts scheduled by the Debtor, excluding disputed claims and any rejection damage claims, but reserving the right to attempt to negotiate settlements with each creditor;

(3) $600,000 of the Debtor's cash to be excluded from acquired assets and left in the estate;

(4) $80,000 of the Debtor's accounts receivable to be excluded from acquired assets and left in the estate;

(5) $120,000 of the Debtor's inventory to be excluded from acquired assets and left in the estate;

(6) $50,000 of post-petition accounts payable which S&S would assume; and

(7) $443,000 credit bid of pre-petition debt.

Stebbins testified that in making the S&S Final Bid, S&S altered its bidding strategy in two ways. First, it mirrored Mission's bid structure to make it easier to compare the two bids and second, it reduced the amount of its credit bid of pre-petition debt to avoid a further challenge by Mission.

The Debtor accepted the S&S Final Bid. Mission declined to be designated as the backup bidder, protesting that the Mission Final Bid was in fact higher and better than the S&S Final Bid. Thereafter, on November 6, 2015, the Debtor filed a notice in the bankruptcy court that it had accepted the S&S Final Bid.

### D. Post-Auction Procedural History

On November 12, 2015, Mission filed the following objections to the proposed sale to S&S (collectively, the "Objections"): (1) Mission Product Holdings, Inc.'s Challenge to Credit Bid of Pre-Petition Credit of Schleicher & Stebbins Hotels, LLC; and (2) Mission Product Holdings, Inc.'s Objection to Conduct of Auction and Sale, as amended. In the Objections, Mission argued, among other things, that: (1) the S&S Final Bid was inferior to the Mission Final Bid; (2) the court should deny S&S' credit bidding rights and recharacterize S&S' claim as equity; (3) the Auction was conducted in bad faith; and (4) the sale should be denied as a sub rosa plan. On November 16, 2015, the Examiner, the Debtor, and S&S each filed responses to the Objections.

The Examiner filed his final report on November 13, 2015, which he subsequently amended with leave of the bankruptcy court on November 24, 2015 (the "Final Report"). In the Final Report, the Examiner concluded, after conducting his own valuation of the bids, that the S&S Final Bid was superior to the Mission Final Bid. He also concluded that Mission and all other creditors would receive better treatment through the proposed sale to S&S than through the only realistic alternative—liquidation. The Examiner reasoned that in light of S&S' secured claim in the amount of $5,500,000, which he determined was not subject to a viable claim for equitable subordination and only $2,000,000 of which might be vulnerable to a recharacterization challenge, the Debtor's creditors would not receive any distribution under any other circumstances. The Examiner further opined that given the limited value of the Debtor's business and the fact that the only parties bidding on the assets were the parties already involved with the Debtor, the marketing efforts by the Debtor and its professionals were adequate and further marketing efforts would not yield a more favorable result.

In his response to the Objections, the Examiner stated, among other things, that he disagreed with Mission's assertion that S&S and the Debtor had "colluded" or that S&S had not acted in good faith in connection with the Auction. He stated as follows:

The Examiner is unconvinced that the cooperation between the Debtor and S&S is collusion[.] Nor is the Examiner convinced that the allegations of Mr. Stebbins' control of the debtor converts reasonable business cooperation into some evil called by Mission "collusion" but which is really a claim of conspiracy.

If by "collusion" Mission means "conspiracy" then the allegations by Mission do not set out such a claim. To make out a claim of conspiracy there must be an agreement to accomplish an unlawful end or to accomplish some lawful end by unlawful means: "A civil conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose, or to accomplish some purpose not in itself unlawful by unlawful means." Jay Edwards, Inc. Baker, 130 N.H. 41, 47, 534 A.2d 706, 709 (1987) (quotations omitted); See, e.g., 18 U.S.C. § 371 ("If two or more persons conspire to commit any offense ... and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined or imprisoned ...").

The Examiner has seen neither unlawful means used nor an unlawful end, and so concludes that there is no conspiracy and therefore no collusion in any nefarious sense.

Even if there were collusion (which the Examiner does not believe exists) it is not a ground to deny approval of the sale, but is only relevant, at best to issues under Section 363(m) if Mission prevails on appeal.

On November 18, 2015, and November 23, 2015, the bankruptcy court conducted an evidentiary hearing to consider the proposed sale and the Objections (the "Sale Hearing"), at which Colistra, McCarthy, Ferdinand, and Stebbins testified. The bankruptcy court admitted eighteen exhibits into evidence. At the conclusion of the Sale Hearing, the bankruptcy court took the matter under advisement and directed the parties to file proposed orders by December 1, 2015. Mission, the Debtor, and S&S all filed supplemental pleadings with proposed orders. Attached to the Debtor's proposed order were revised copies of the Asset Purchase Agreement with S&S.

On December 15, 2015, the Debtor filed a Status Report informing the bankruptcy court that the Debtor anticipated its cash balance as of December 18, 2015, would be approximately $60,000, and if it did not close the sale on or before December 18, 2015, it would need to draw an additional $150,000 in DIP Financing in order to have sufficient funds to operate through December 31, 2015.

### E. The Bankruptcy Court's Order and Opinion.

On December 18, 2015, the bankruptcy court entered the Sale Order. In its accompanying decision, the bankruptcy court made thorough and detailed factual findings and conclusions based on the record, the evidence presented at the Sale Hearing, and the conclusions of the Examiner. See In re Tempnology, LLC, 542 B.R. 50 (Bankr. D.N.H. 2015). Noting the need for heightened scrutiny because the sale would take place outside of a confirmed plan of reorganization and because the proposed purchaser, S&S, was an insider, the bankruptcy court determined: (1) there was a valid business reason for a sale prior to a confirmed plan of reorganization, and the proposed sale to S&S made good sense in the overall context of the reorganization as there was no alternative that would yield a benefit to creditors; (2) the marketing of the Debtor's assets was sufficient and appropriate; (3) there was "no evidence in the record establishing any misconduct or collusion in the sale process by the Debtor and S&S"; (4) Mission's assertions that the Debtor's constant inflation of the value of S&S' bids evidenced collusion and misconduct were refuted by "simple math"; (5) Mission failed to demonstrate a compelling reason why S&S' credit bidding rights under § 363(k) should be limited; (6) the record did not support Mission's assertion that the Debtor was substantially con-

trolled by Stebbins; (7) the proposed sale was not a de facto plan and creditors "were afforded protections consistent with the statutory safeguards attendant to the Chapter 11 confirmation process"; (8) there was "no evidence of fraud, collusion, or any other tainting of the sale process," and Mission failed to demonstrate the proposed sale was anything other than an arm's length transaction; and (9) S&S was a good faith purchaser and entitled to the protections afforded by § 363(m).

Specifically as to the finding that S&S was a good faith purchaser, the bankruptcy court stated as follows:

Based on the findings outlined above, the Court concludes that S&S purchased for value. Despite the repeated invective, Mission has failed to demonstrate that the proposed sale is anything other than an arm's length transaction. There is no evidence of fraud, collusion, or any other tainting of the sale process in the record. To the contrary, the witness testimony reflects that Stebbins and S&S essentially divorced themselves from the Debtor when it became clear that a reorganization was needed. McCarthy and Ferdinand both testified that neither Stebbins nor S&S had any role [in] the Debtor's operations or marketing efforts once Stebbins and Schleicher resigned from the management committee. Colistra, the professional responsible for the Debtor's marketing strategy, testified that Phoenix had no contact with S&S other than to commence stalking horse negotiations when no other could be found. Even if the initial sale proposal pre-dated the involvement of independent counsel, Stebbins, McCarthy, and Ferdinand each credibly testified that no agreement was reached until the details were negotiated by counsel. Notably, the entire sale process was overseen by the Examiner and the United States Trustee, and neither have voiced any con-cerns or objections. Therefore, the Court finds that S&S is a good faith purchaser entitled to the protection of 11 U.S.C. § 363(m).

Thus, the bankruptcy court overruled Mission's Objections and approved the sale to S&S. In the Sale Order, the bankruptcy court ordered the stay imposed by Bankruptcy Rule 6004(h) and 6006(d) was waived, the order would be immediately effective upon entry, and the Debtor was authorized and directed to consummate the sale.

Mission did not seek to alter or amend the Sale Order or to have the sale stayed, and on December 21, 2015, the Debtor filed a Notice of Closing in which it informed the bankruptcy court that, as of 6:00 p.m. on December 18, 2015, the Debtor had closed the transaction with S&S as contemplated by the Sale Order. On December 28, 2015, ten days after the entry of the Sale Order, Mission filed its notice of appeal.

## JURISDICTION

### I. Finality

We have jurisdiction to hear appeals from final judgments, orders and decrees of the bankruptcy court. See 28 U.S.C. § 158(a)(1). In the bankruptcy context, an order is "final" if it completely resolves "all the issues pertaining to a discrete dispute within the larger proceeding." Morse v. Rudler (In re Rudler), 576 F.3d 37, 43 (1st Cir. 2009) (quoting Perry v. First Citizens Fed. Credit Union (In re Perry), 391 F.3d 282, 285 (1st Cir. 2004)). Because the Sale Order effectively resolved all issues between the parties relating to the sale of the Debtor's assets, it is final. Our jurisdiction, however, does not rest on finality alone. Mootness will deprive us of jurisdiction to review a final order. See Richmond v. Sovereign Bank

(In re Formatech, Inc.), No. MW 12-013, 2013 WL 87406, at *1 (1st Cir. BAP Jan. 8, 2013) (citation omitted).

## II. Mootness

■ Mootness is also a threshold jurisdictional issue. See GE Capital Franchise Fin. Corp. v. Richardson (In re Newport Creamery, Inc.), 295 B.R. 408, 417 (1st Cir. BAP 2003) (citations omitted). The Appellees argue this appeal should be dismissed as it is: (1) statutorily moot pursuant to § 363(m) because Mission failed to obtain a stay pending appeal; and (2) equitably moot because Mission failed to obtain a stay pending appeal, the sale of assets to S&S is complete, and the Panel is unable to fashion a remedy.

### A. Statutory Mootness

Section 363(m) provides:

The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

■ "The effect of § 363(m) is that 'when an order confirming a sale to a good faith purchaser is entered and a stay of that sale is not obtained, the sale becomes final and cannot be reversed on appeal.' " Anheuser–Busch, Inc. v. Miller (In re Stadium Mgmt. Corp.), 895 F.2d 845, 847 (1st Cir. 1990) (quoting Creditors Comm. v. Armstrong Bus. Credit Corp. (In re Saco Local Dev. Corp.), 19 B.R. 119, 121 (1st Cir. BAP 1982)). Without a stay of the sale, the court usually has no power to fashion a remedy because it cannot undo

the sale, even if it were to find the authorization was erroneous. Id. (citations omitted); see also Mark Bell Furniture Warehouse, Inc. v. D.M. Reid Assocs. (In re Mark Bell Furniture Warehouse, Inc.), 992 F.2d 7, 8 (1st Cir. 1993); Kasparian v. Conley (In re Conley), 369 B.R. 67, 71 (1st Cir. BAP 2007).

"Appellate courts have interpreted this section to prevent the overturning of a completed sale to a bona fide third party purchaser in the absence of a stay. ... This rule protects the finality of bankruptcy sales and the reasonable expectations of third party purchasers. ... [and] [i]t also reflects the inability of courts to supply a remedy once property has left the bankruptcy estate." Wintz v. American Freightways, Inc. (In re Wintz Cos.), 219 F.3d 807, 811 (8th Cir. 2000) (internal citations omitted); see Licensing by Paolo v. Sinatra (In re Gucci), 105 F.3d 837, 840 (2d Cir. 1997) (noting that "regardless of the merit of an appellant's challenge to a sale order, we may neither reverse nor modify the judicially-authorized sale if the entity that purchased or leased the property did so in good faith and if no stay was granted"); see also Oakville Dev. Corp. v. Fed. Deposit Ins. Corp., 986 F.2d 611, 614 (1st Cir. 1993) (holding that failure to obtain a stay pending appeal of district court's refusal to reinstate injunction before a foreclosure sale renders the appeal moot).

Green v. Gray, Nos. 12–10604–DJC and 12–10835–DJC, 2013 WL 1124731, at *5 (D. Mass. Mar. 18, 2013).

■ Thus, it is well settled in the First Circuit that under § 363(m), a sale to a purchaser acting in good faith may not be reversed on appeal unless the aggrieved party obtains a stay of the sale. Canzano v. Ragosa (In re Colarusso), 382 F.3d 51, 61–62 (1st Cir. 2004) (citing In re Stadium

Mgmt. Corp., 895 F.2d at 847). As a result, in the absence of a stay, the court must dismiss a pending appeal as moot. There is, however, an exception to this general rule. The First Circuit has stated that a stay is not required to challenge a sale on the ground that § 363(m) does not apply because the purchaser did not act in good faith. In re Colarusso, 382 F.3d at 61 n.10 (citing In re Sax, 796 F.2d 994, 997 n.4 (7th Cir. 1986)); see also Video Concepts, LLC v. Volpe Indus., Inc. (In re Volpe Indus., Inc.), No. 13–10300–DPW, 2013 WL 4517983, at *3 (D. Mass. Aug. 23, 2013).

■ Mission did not seek or obtain a stay of the Sale Order pending this appeal. It did, however, object to the proposed sale to S&S on the ground that S&S, who was an insider of the Debtor, was not and could not be a good faith purchaser, and Mission included among its issues on appeal the question of whether the bankruptcy court erred in finding S&S was a good faith purchaser for value. Thus, the failure to obtain a stay is not fatal to Mission's appeal.

But, in the absence of a stay, § 363(m) operates to limit appellate review of a sale order to the specific question of whether the purchaser was a good faith purchaser. See In re Gucci, 105 F.3d at 839 (holding "appellate jurisdiction over an unstayed sale order issued by a bankruptcy court is statutorily limited to the narrow issue of whether the property was sold to a good faith purchaser") (emphasis omitted); Cent. Me. Healthcare Corp. v. Parkview Adventist Med. Ctr., No. 2:15–cv–00527–JDL, 2016 U.S. Dist. LEXIS 48676, at *8–9 (D. Me. Apr. 11, 2016) (noting "because there was no stay order … § 363(m) operates to limit appellate review of the Sale

Order to the specific question of whether [the purchaser] was a good faith purchaser."); Dick's Clothing & Sporting Goods, Inc. v. Phar–Mor, Inc., 212 B.R. 283, 290 (N.D. Ohio 1997) (ruling because appellant was unsuccessful at obtaining a stay, all of the issues raised in the appeal were moot except for the issue of good faith).

Therefore, although Mission failed to obtain a stay, its appeal is not statutorily moot to the extent it challenges the good faith status of S&S. The appeal is limited, however, to the issue of good faith.

### B. Equitable Mootness

■ The doctrine of equitable mootness allows an appellate court to dismiss a bankruptcy appeal if " 'an unwarranted or repeated failure to request a stay enabled developments to evolve in reliance on the bankruptcy court order to the degree that their remediation has become impracticable or impossible,' " or if " 'the challenged bankruptcy court order has been implemented to the degree that meaningful appellate relief is no longer practicable even though the appellant may have sought a stay with all due diligence.' " Prudential Ins. Co. of Am. v. SW Boston Hotel Venture, LLC (In re SW Boston Hotel Venture, LLC), 748 F.3d 393, 402 (1st Cir. 2014) (quoting Hicks, Muse & Co. v. Brandt (In re Healthco Int'l, Inc.), 136 F.3d 45, 48 (1st Cir. 1998)); see also In re Conley, 369 B.R. at 71–72. Although the issue of equitable mootness in bankruptcy appeals arises most frequently in cases involving confirmation orders, courts have also applied the doctrine to bankruptcy appeals involving other orders, including orders authorizing sales under § 363.[5] See,

---

**5.** It is important to note that, in 2015, a series of significant courts of appeals decisions addressed the equitable mootness doctrine, with some debate as to whether the doctrine should continue to exist. See In re One2One

Communs., LLC, 805 F.3d 428 (3d Cir. 2015); JPMCC 2007–C1 Grasslawn Lodging, LLC v. Transwest Resort Props., Inc. (In re Transwest Resort Props., Inc.), 801 F.3d 1161 (9th Cir. 2015); and Tribune Media Co., 799 F.3d

e.g., Braemer v. Lowey, No. 08–cv–348–P–S, 2009 WL 465972 (D. Me. Feb. 24, 2009) (dismissing appeal of sale order as equitably moot); Bonnett v. Gillespie (In re Irish Pub Arrowhead Land, LLC), BAP No. AZ–13–1024–PaKuD, 2014 WL 486955, at *5 (9th Cir. BAP Feb. 6, 2014) ("To be sure, equitable mootness applies to appeals of orders concerning sales under § 363.") (citation omitted). The party arguing for dismissal bears the burden of establishing equitable mootness. See Braemer v. Lowey, 2009 WL 465972, at *1. Although failure to seek a stay weighs in favor of finding mootness, it is insufficient on its own to render the appeal equitably moot. "The court must consider pragmatic considerations, specifically, whether granting appellate relief would adversely affect third parties regardless of whether the appellant sought a stay, ... or is impracticable because of the extent to which the order has been implemented." ROK Builders, LLC v. 2010–1 SFG Venture, LLC, No. 13–cv–16–PB, 2013 WL 3762678, at *6 (D.N.H. July 16, 2013) (citations omitted).

■ The Appellees argue that this appeal is equitably moot because Mission did not diligently seek a stay pending appeal, and the relief requested would be complex and difficult for the Panel to provide as the sale has closed. According to the Appellees, the Debtor, S&S, and the creditors whose debts S&S assumed have relied on the finality of the Sale Order. Specifically, they contend S&S has: (1) made substantial payments to, or reached agreements with, the Debtor's pre- and post-petition creditors whose claims S&S assumed; (2) purchased $250,000 of the Debtor's inventory and committed to buy the remainder at cost on or before September 30, 2016; (3) hired all of the Debtor's former employees; and (4) started marketing and selling products to customers. They also contend the Debtor has started to liquidate its limited remaining assets and retained a chief liquidation officer to do so. Thus, they argue, appellate relief would adversely affect third parties and it would be impracticable for the Panel to fashion any effective relief.

Mission counters, contending that although the sale has closed, there has been no third party reliance and there is no third party that will suffer from reversal because the sale itself was no more than a change in entity—the Debtor's business has the same location, same name, same employees, same management structure, same assets, same debts, and same controlling owner (S&S) as before the sale. According to Mission, the Debtor's business was largely unaffected by the sale and the Panel has ample authority to fashion a remedy.

As noted above, the Appellees have the burden of establishing the appeal is equitably moot. Although they press their arguments vigorously, the Appellees have not carried that burden. We are not convinced the transactions which have occurred since the closing of the sale are incapable of being unwound. Thus, we conclude this appeal is not equitably moot.

## STANDARD OF REVIEW

■ We review a bankruptcy court's findings of fact for clear error and its conclusion of law de novo. See Jeffrey P. White & Assocs., P.C. v. Fessenden (In re Wheaton), 547 B.R. 490, 496 (1st Cir. BAP

272 (3d Cir. 2015); but see Ochadleus v. City of Detroit (In re City of Detroit), 838 F.3d 792, 2016 WL 5682704 (6th Cir.2016) (noting that no circuit has yet abolished equitable mootness and, therefore, it remains a viable doctrine). The First Circuit has not weighed in on this recent debate.

2016) (citation omitted). As discussed above, § 363(m) prohibits us from disturbing a sale on appeal that was not stayed if the buyer purchased the property in good faith. See 11 U.S.C. § 363(m). Good faith is a mixed question of law and fact. In re Mark Bell Furniture Warehouse, 992 F.2d at 8 (citation omitted); In re Cable One CATV, 169 B.R. 488, 492 (Bankr. D.N.H. 1994) (citation omitted); cf. Green v. Gray, 2013 WL 1124731, at *4 (applying clearly erroneous standard to bankruptcy court's determination buyer was good faith purchaser). "[A] mixed question of law and fact [is] subject to the clearly erroneous standard, unless the bankruptcy court's analysis was 'infected by legal error.'" Winthrop Old Farm Nurseries, Inc. v. New Bedford Inst. for Sav. (In re Winthrop Old Farm Nurseries, Inc., 50 F.3d 72, 73 (1st Cir. 1995) (citing Williams v. Poulos, 11 F.3d 271, 278 (1st Cir. 1993)). "The bankruptcy court findings will be considered clearly erroneous if, after a review of the entire record, we are left with the definite and firm conviction that a mistake has been committed." Bezanson v. Thomas (In re R & R Assocs. of Hampton), 402 F.3d 257, 264 (1st Cir. 2005) (citation omitted) (internal quotations omitted). "If two views of the evidence are possible, the trial judge's choice between them cannot be clearly erroneous." Nickless v. Catton (In re Catton), 542 B.R. 33, 36 (D. Mass. 2015) (citing Williams v. Poulos, 11 F.3d at 278).

Because Mission did not obtain a stay, the only issue before us is whether the bankruptcy court clearly erred in finding S&S was a good faith purchaser.

## DISCUSSION

Although the Bankruptcy Code does not define the term "good faith purchaser," the First Circuit has held that a good faith purchaser is one who purchases property (1) in good faith; (2) for value; and (3) without knowledge of adverse claims. See In re Mark Bell Furniture Warehouse, 992 F.2d at 8; Oakville Dev. Corp., 986 F.2d at 614; Greylock Glen Corp. v. Cmty. Sav. Bank, 656 F.2d 1, 4 (1st Cir. 1981). The "good faith" of a buyer concerns the integrity of the buyer's conduct during the sales process. In re Cable One CATV, 169 B.R. at 493 (citations omitted). "Typically, the misconduct that would destroy a purchaser's good faith status ... involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." Id. (citations omitted) (internal quotations omitted). Mere allegations of collusion, without convincing direct evidence, are insufficient to establish lack of good faith. See, e.g., id. at 493–94 (finding good faith satisfied, "despite endless accusations of secret deals and collusion," where "the debtor has failed to introduce any direct evidence of unfair dealings, under-the-table negotiations, or selective information dissemination between [the buyer] and the trustee to substantiate allegations of collusion").

Mission contends the bankruptcy court erred in finding S&S was a good faith purchaser because: (1) S&S was an interested insider and the evidence presented at the Sale Hearing, as well as the post-sale conduct of the Debtor and S&S, are direct evidence of collusion between them; and (2) the bankruptcy court erroneously applied the common business judgment standard rather than the heightened scrutiny standard when considering the proposed sale to an insider. We disagree. Nothing in the record persuades us that the bankruptcy court's good faith finding was clearly erroneous. We also conclude that the bankruptcy court applied the correct legal standard.

## I. Insider Status and Allegations of Collusion

█ It is well established that a party's status as an insider does not automatically prevent it from being a purchaser in good faith. See In re Family Christian, LLC, 533 B.R. 600, 627 (Bankr. W.D. Mich. 2015) ("[N]othing within the Bankruptcy Code prohibits insiders from purchasing estate assets.") (citations omitted). Although the sale of property to an insider is subject to careful scrutiny, see In re Tidal Constr. Co., 446 B.R. 620, 624 (Bankr. S.D. Ga. 2009) ("[Section] 363 sales to insiders are subject to higher scrutiny because of the opportunity for abuse"), it is not per se bad faith for an insider to purchase the assets of the debtor. See Coleman v. ANMP (In re Dexter Distrib. Corp.), 434 Fed.Appx. 618, 619 (9th Cir. 2011) (citation omitted); Hower v. Molding Sys. Eng'g Corp., 445 F.3d 935, 939 (7th Cir. 2006); U.S. Small Business Admin. v. Xact Telesolutions, Inc. (In re Xact Telesolutions, Inc.), No. DKC 2005–1230, 2006 WL 66665, at *6 (D. Md. Jan. 10, 2006) ("[T]he majority of courts have held that a sale of assets to a fiduciary or insider is not bad faith per se.") (citations omitted). Thus, a sale to an insider, without more, does not establish a lack of good faith.[6]

█ Mission, arguing there was clear evidence at the Sale Hearing of collusive conduct between the Debtor and S&S which establishes S&S was not a good faith purchaser, points to the following:

1. S&S tendered a loan forbearance agreement to the Debtor which contained a requirement that the Debtor file bankruptcy and conduct a § 363 sale, which agreement the Debtor, controlled by S&S/Stebbins' appointees, did not negotiate in any way;

2. the Debtor's management, selected by the principals of S&S, expressly limited marketing of the Debtor's assets, by banning contact with the customers most likely to buy the assets;

3. the Debtor made no effort to challenge the credit bid rights of S&S despite the testimony of the Debtor's own investment banker that such a credit bid would, and did, chill the sale and discourage bidding;

4. the Debtor and S&S colluded in having the Debtor accept as a qualifying bid S&S' credit bid which included loan proceeds that had not been advanced, even though the Debtor's own investment banker testified that a credit bid could not be made on unadvanced funds;

5. the Debtor and S&S colluded to have S&S advance money to the Debtor on the eve of the Auction in order to support an S&S credit bid, even though the Debtor did not need to borrow the money;

6. the Debtor consistently colluded with S&S to over value each S&S bid at Auction, by double-counting the value of cash to be excluded from acquired assets and left in the estate by S&S;

7. the Debtor and S&S failed to disclose at the Auction and at the Sale Hearing that S&S would not allow the Debtor to

---

**6.** As one court noted, there is a "good reason for allowing such transactions [to insiders]." Hower, 445 F.3d at 939. "That is, the failure of a company may be due to adverse market conditions—rather than flagrant mismanagement—and the former officers may be in the best position to make use of the assets and formulate a successful future business model." Id. "As a result, there may be circumstances where an effective repurchase of assets is the most efficient business outcome." Id. Thus, in order to encourage insolvent debtors to continue operating and generating revenue for creditors, they are permitted to sell property to insiders, so long as the insider status is disclosed at the beginning of the case, and there is no evidence of collusion. Id.

sell the inventory S&S had excluded from acquired assets and left in the estate, rendering this component of the bid valueless;

8. the Debtor and S&S engaged in numerous off-the-record, private communications during the Auction regarding the structuring of the S&S bid;

9. the Debtor unilaterally changed the value of its assets for Auction purposes solely to benefit S&S;

10. the Debtor and S&S failed to disclose various waivers by S&S of terms and conditions of the S&S asset purchase agreement with respect to hiring of employees, executive contracts and assumption of debt; and

11. the Debtor's executives assumed at all times that they would run the business purchased by S&S and did not expect or plan for a third-party purchase.

These are the same allegations Mission raised before the bankruptcy court, and which the bankruptcy court found to be unsupported by the evidence. The bankruptcy court effectively addressed and rejected all of these claims, finding "no evidence of fraud, collusion, or any other tainting of the sale process in the record."

Mission's allegation that Stebbins' prepetition involvement as a member of the Debtor's management committee is evidence of his control of the Debtor and collusion between S&S and the Debtor, is unsupported by the evidence. As the bankruptcy court pointed out, Stebbins testified, when it became apparent a workout between S&S and the Debtor would be necessary, both Stebbins and Schleicher resigned from the Debtor's management committee, the Debtor and S&S each retained independent counsel, and Stebbins took no further part in the Debtor's operations or Phoenix's marketing efforts. The bankruptcy court found Stebbins' testimo-

ny to be credible, and we give great deference to the bankruptcy court's factual findings when they are based on the credibility and demeanor of the witnesses. See Robin Singh Educ. Servs., Inc. v. McCarthy (In re McCarthy), 488 B.R. 814, 825 (1st Cir. BAP 2013) (citation omitted). Moreover, Stebbins' testimony was supported by that of McCarthy and Ferdinand, each of whom testified that neither Stebbins nor S&S had any involvement with the Debtor's operations or marketing efforts once Stebbins and Schleicher resigned from the management committee.

As to Mission's allegations that S&S, through Stebbins, dictated the terms of important transactions, such as the loan forbearance agreement and Asset Purchase Agreement, and the Debtor simply agreed to these without negotiation, the bankruptcy court found this was "not a proper characterization of the record." As the bankruptcy court observed, while the salient terms of the forbearance agreement and Asset Purchase Agreement may have been initially discussed at a meeting held in July 2015, before counsel became involved, Stebbins, McCarthy, and Ferdinand each testified that the details of those agreements were negotiated later by their respective counsel, and no agreement was reached until those details were negotiated. The bankruptcy court found this uncontroverted testimony to be credible, and we give the bankruptcy court's credibility finding great deference.

As to Mission's allegations that there were flaws in the sale process that rendered the Auction unfair, the bankruptcy court concluded there was no prejudice. The bankruptcy court noted that, although the credit bid component of S&S' initial stalking horse bid exceeded the amount of loan proceeds actually advanced by S&S at the time the Debtor accepted it, by the date of the Auction, S&S had advanced the

full amount of the DIP Financing. The bankruptcy court also rejected Mission's argument the Debtor engaged in inappropriate off-the-record bid negotiations with S&S. The bankruptcy court noted such communications were consistent with the bidding procedures announced at the beginning of the Auction and applied to all parties equally, and Mission failed to explain how these negotiations tainted the Auction. As to Mission's claim that the Debtor's mid-Auction revaluation of its inventory and accounts receivable was intended to devalue Mission's bids, the bankruptcy court found that the discount applied to both parties' bids, and, therefore, Mission remained on an equal footing with S&S and its objection was "ill-taken." The bankruptcy court also found "simple math" refuted Mission's assertions that collusion and misconduct were apparent by the Debtor's constant inflation of the value of S&S' bids.

On appeal, Mission presses its arguments that the bidding process was "deeply flawed" and S&S cannot be a good faith purchaser because the Debtor plainly accepted a bid from S&S when that bid included a credit bid component that was underfunded at the time it was made. Mission argues the bankruptcy court's determination that the underfunded bid was of no consequence because it was fully funded prior to the Auction is flawed. According to Mission, both parties knew the credit bid was underfunded and, therefore, it is evidence of their collusion. Mission does not acknowledge, however, that at the October 2, 2015 hearing on the Sale Motion, S&S agreed to modifications of the bidding procedures to resolve Mission's objections and to allow the sale to proceed. S&S agreed that only the amount of the post-petition loans made prior to the Auction would be included in its credit bid, and it reserved its right to credit bid its pre-petition debt.[7] Mission did not object to this modification. Thus, Mission's argument that the S&S Final Bid was improper because it was partly based on "unadvanced funds" is unjustified and does not require us to conclude the bankruptcy court's good faith finding was clearly erroneous.

Mission also points to the off-the-record negotiations between the Debtor and S&S as "direct evidence" of collusion. As the bankruptcy court found, however, the parties were informed at the beginning of the Auction that off-the-record negotiations were permitted and Mission did not object at that time. In addition, Mission has not explained how these negotiations tainted the Auction. Moreover, although Mission cites to In re Family Christian, supra, for the proposition that off-the-record commu-

---

7. When discussing S&S' proposed post-petition credit bid, Mr. Desiderio (the Debtor's counsel) and Mr. Candon (S&S' counsel) stated as follows:

> MR. DESIDERIO: The stalking horse bid would be $750,000, which is the funds advanced post-petition, plus $100,000 in assumed liabilities.
> THE COURT: Well, that's what it has been or you expect to be?
> MR. DESIDERIO: Expect to be by the auction date. . . .
> ***
> MR. DESIDERIO: "My understanding is that S&S would reserve the right to credit bid its full amount [as of] the auction . . ."

> ***
> MR. CANDON: So with respect to the challenge period I'm anticipating, and I think this is a concession on the part of the stalking horse to do this and a way of having only the post-petition amount be the credit bid amount, that there is no need for a challenge period prior to the auction. You show up at the auction and you have a bid and if it turns out—
> THE COURT: Well, you—if—you're saying that the credit bid is limited to the numbers that you've—he's mentioned.
> MR. CANDON: Reserving our rights to credit bid the amount of our secured claim.

nications during an auction are inappropriate and will invalidate a sale to an insider, it misconstrues the holding in that case. In In re Family Christian, the bankruptcy court was "troubled" by an off-the-record telephone call between the debtor's chief executive officer and the principal of the stalking horse during an auction. 533 B.R. at 625. Following the call, the stalking horse bidder immediately submitted its final bid and ceased additional bidding without further explanation. Id. This led the bankruptcy court to conclude the debtor may have represented to the stalking horse bidder that it would be declared the winning bidder. Id. The court found this conduct to be, at the very least, "reckless," but noted there was insufficient evidence to infer fraud. Id. at 626. The court also found, however, the debtor provided insiders with releases without explanation and without accounting for their value, and therefore, that, "although the auction was not as unfair as GBH insists, it was flawed." Id. The court ultimately determined the debtor had not satisfied its burden under the heightened scrutiny standard applied to insider sales which requires articulation of a sound business justification for selling all of its assets to an insider. Id. at 626–27. Thus, In re Family Christian does not stand for the proposition that off-the-record discussions are per se evidence of collusion requiring a finding that the proposed purchaser is not acting in good faith. Here, the bankruptcy court considered all the evidence and, noting that the opportunity for off-the-record negotiations during the Auction was expressly permitted without complaint by Mission, determined there was no evidence of collusion or fraud.

Mission also argues that the Debtor and S&S colluded to have S&S advance an additional $500,000 to the Debtor one week prior to the Auction solely for the purpose of creating the consideration for S&S'

$750,000 credit bid, even though the Debtor did not need to borrow the money, as evidenced by the fact that the Debtor had $600,000 in its cash accounts as of the Auction. The bankruptcy court rejected this argument. As the court pointed out, at the Sale Hearing, Ferdinand testified that the $500,000 advance from S&S was necessary to meet payroll obligations, address liquidity concerns as he thought some of the collections from customers would be delayed, and fund the payment of the Debtor's professionals, all of which were contemplated under the Third Interim DIP Order. Moreover, although the Debtor had $600,000 in its accounts at the November 2, 2015 Auction, only approximately $60,000 remained as of the sale closing, which supports a determination that the Debtor needed the advance from S&S.

Mission also presents a new argument on appeal—that the Debtor's post-closing sale of inventory to S&S is evidence of collusion between the parties and invalidates the bankruptcy court's good faith finding. In support, Mission cites Zuercher Trust of 1999 v. Schoenmann (In re Zuercher Trust of 1999), BAP No. NC–14–1440–KuWJu, 2016 WL 721485, at *1 (9th Cir. BAP Feb. 22, 2016), for the proposition that our examination of good faith is not limited to pre-sale circumstances, but can include facts revealed after the sale that bear on good faith. In Zuercher Trust, the panel noted:

> [W]hen any new facts come to light after the sale is completed plausibly calling into question the good faith of the buyer, the bankruptcy estate and the purchaser only can enjoy the benefit of § 363(m)'s limitation on appellate remedies when the bankruptcy court has duly considered those additional facts and has effec-

tively determined the good faith of the purchaser in light of the additional facts.

Id.

As post-sale evidence of the collusion between the Debtor and S&S, Mission points to a motion to sell inventory pursuant to § 363(b) filed by the Debtor on February 25, 2016 ("Inventory Motion"), while this appeal was pending. According to Mission, S&S had agreed in the S&S Final Bid to leave inventory in the estate as an excluded asset, yet after the sale it required the Debtor to sell that inventory to S&S at a steep discount. This, Mission claims, is evidence that S&S was not a good faith purchaser.

First, we are not convinced that it is appropriate for an appellate court to consider post-sale events in determining whether the bankruptcy court erred in finding a purchaser was a good faith purchaser. Second, Mission mischaracterizes this particular post-petition event, by failing to acknowledge that the post-closing sale of inventory to S&S was an anticipated outcome of the sale. As the Examiner noted in his Final Report:

> The value of the assets left at Closing is uncertain. But, if the Closing occurs quickly after the approval of the sale, then the value of the assets cannot vary too much from the representations made at the auction. The largest value as represented at the auction was the inventory. The inventory is almost all finished goods inventory. The likely buyer of the inventory is S&S which (after Closing) will have just acquired a business with potential sales orders and no inventory. It will need inventory to generate accounts receivable and to satisfy its customers. The logical result should be that S&S will acquire the inventory from the estate at something close to cost and not at liquidation because its alternative is

cost, but with a delay equal to the time to manufacture.

In fact, the Debtor engaged David Feller as its chief liquidation officer to liquidate its remaining assets, including inventory. Mission did not oppose the engagement. When it filed the Inventory Motion, the Debtor requested authority to sell inventory to S&S at a price which was no less than 75% of the Debtor's cost in order to give Mr. Feller maximum flexibility to liquidate the inventory on a timely basis. As anticipated by the Examiner, after a negotiation with Mr. Feller, S&S (or its designee) agreed to purchase substantially all of the Debtor's inventory at 96% of the Debtor's cost on a rolling basis. In fact, S&S ultimately agreed to purchase all of the inventory at 100% of cost on a rolling basis with all such purchases to be complete on or before September 30, 2016. The total purchase price of the inventory was approximately $1,190,000. The bankruptcy court entered an order approving the sale of the inventory to S&S, overruling Mission's objection. Mission did not appeal the order. Thus, we conclude that the Debtor's post-closing sale of inventory to S&S does not require us to hold that the bankruptcy court's good faith finding was clearly erroneous.

Based on the record, we cannot conclude any of the bankruptcy court's findings relating to S&S' good faith were clearly erroneous or without support in the record. Mission points to no evidence that convincingly contradicts the bankruptcy court's findings or demonstrates S&S engaged in fraud, colluded with the Debtor, or attempted to take unfair advantage of other bidders. Rather, the evidence supports the bankruptcy court's findings that S&S did not interfere with the sales and marketing process. The record shows S&S agreed to extend DIP Financing for a period long

enough to sustain a full marketing effort for the Debtor's assets and to conduct the sale within a reasonable time frame without the need for expedited consideration and treatment by the bankruptcy court. Additionally, the record shows S&S agreed to modification of the sale procedures and modified its offering price to allow the sale process to proceed to the Auction. In the end, the Final Report, the Sale Hearing, and the pleadings filed in support of the Sale Motion demonstrated the sale was conducted in a fair and open process. Although Mission had the opportunity to present evidence to support its allegations, Mission elected not to call its own witnesses during the Sale Hearing.

As thoroughly discussed in the Sale Order, the bankruptcy court found the bidding procedures, the negotiations with S&S, the Auction, and the Sale Hearing were conducted without collusion and in good faith. It found that S&S participated in the Auction and the Sale Hearing in good faith and bought the assets of the Debtor in good faith and for fair value; i.e., that S&S was a good faith purchaser. The bankruptcy court's findings, which were based upon a well-developed record, were not clearly erroneous and we will not disturb them.

### B. Heightened Level of Scrutiny

Mission also argues the bankruptcy court's determination that S&S was a good faith purchaser was clearly erroneous because it failed to apply the requisite heightened scrutiny to the sale. There is no merit to Mission's contention. First, the bankruptcy court acknowledged that it needed to apply a heightened level of scrutiny to the sale because the sale was to occur outside a confirmed plan of reorganization, and because it involved a sale to an insider. It then did so before it approved the sale.

The bankruptcy court thoroughly examined the relationship between the Debtor and S&S. In fact, because the proposed sale involved an insider making a credit bid, the bankruptcy court, at the requests of the U.S. Trustee and Mission, approved the appointment of the Examiner, who was tasked with monitoring the sale process and analyzing S&S' claims and liens. After attending the hearings and the Auction and conducting an independent investigation, the Examiner supported the sale and disagreed with Mission's allegations of collusion and misconduct. Neither the Examiner nor the U.S. Trustee questioned the propriety of the Auction or the sale to S&S. These factors, in addition to the ones discussed above, convince us that the bankruptcy court applied the appropriate level of heightened scrutiny to the sale of the Debtor's assets to S&S.

### CONCLUSION

For the reasons set forth above, we **AFFIRM.**