# United States Court of Appeals
## For the First Circuit

Nos. 16-9012, 16-9015

IN RE: OLD COLD LLC, f/k/a Tempnology, LLC,[*]

Debtor.

MISSION PRODUCT HOLDINGS, INC.,

Appellant/Cross-Appellee,

v.

OLD COLD LLC, f/k/a Tempnology, LLC and
SCHLEICHER AND STEBBINS HOTELS LLC,

Appellees/Cross-Appellants.

APPEALS FROM THE BANKRUPTCY APPELLATE PANEL
FOR THE FIRST CIRCUIT

Before

Torruella, Lynch, and Kayatta,
Circuit Judges.

Robert J. Keach, with whom Lindsay K.Z. Milne and Bernstein, Shur, Sawyer & Nelson, P.A. were on brief, for appellant/cross-appellee.

Christoper M. Desiderio, with whom Daniel W. Sklar and Nixon Peabody LLP were on brief, for appellee/cross-appellant Old Cold LLC.

Christoper M. Candon, with whom Sheehan Phinney Bass & Green

---

[*] By order dated December 23, 2015, the bankruptcy court granted Debtor's motion to amend the caption by replacing "Tempnology, LLC" with "Old Cold LLC."

PA was on brief, for appellee/cross-appellant Schleicher & Stebbins Hotels LLC.

---

January 12, 2018

---

**KAYATTA**, **Circuit Judge**.  Chapter 11 debtor Tempnology, LLC ("Debtor") auctioned off its assets pursuant to section 363 of the Bankruptcy Code.  Schleicher and Stebbins Hotels LLC ("S&S") was declared the winning bidder over Mission Product Holdings, Inc. ("Mission").  With the bankruptcy court's approval, Debtor and S&S completed the sale.  On appeal, Mission now asks that we order the bankruptcy court to unwind the sale and treat Mission as the winning bidder.  Because the sale to S&S was completed and S&S is a good faith purchaser entitled to protection under section 363(m), we affirm without reaching the merits of Mission's various challenges to the sale.  Our explanation follows.

## I.

Debtor made specialized products -- such as towels, socks, headbands, and other accessories -- designed to remain at low temperatures even when used during exercise.  It marketed these products under the "Coolcore" and "Dr. Cool" brands.  S&S is an investment holding company with its primary interest in hotels.  Prior to Debtor's bankruptcy, S&S owned a majority interest in Debtor.  Until just under two months before Debtor commenced this Chapter 11 proceeding, Mark Schleicher and Mark Stebbins -- S&S's two principals -- sat on Debtor's management committee.

Almost three years before petitioning for bankruptcy, Debtor executed a Co-Marketing and Distribution Agreement with Mission.  This Agreement granted Mission a nonexclusive, perpetual

license to Debtor's intellectual property and an exclusive distributorship for certain of Debtor's manufactured products. The Agreement forbade Debtor from selling the covered products in Mission's exclusive territory, which included the United States.

When the relationship between Mission and Debtor soured, Mission exercised its contractual right to terminate the Agreement without cause on June 30, 2014. This election triggered a two-year "Wind-Down Period" through July 1, 2016, during which Mission's rights remained in effect. Debtor responded by seeking to terminate the Agreement for cause, claiming as a breach Mission's hiring of Debtor's former president. Unlike Mission's election, Debtor's termination for cause, if effective, would have terminated the Agreement without a Wind-Down Period. The dispute went before an arbitrator, who found that Debtor's attempted termination for cause was improper, potentially entitling Mission to damages for Debtor's failure to abide by the Agreement leading up to arbitration. The hearing to determine the amount of these damages has been stayed pending the resolution of Debtor's bankruptcy petition.

As the parties' relationship deteriorated, so too did Debtor's financial results. Debtor posted multi-million dollar losses in 2013, 2014, and 2015, for which it blames the Agreement with Mission. To combat its liquidity problems, Debtor took on increased debt. S&S, which had already made substantial loans to

Debtor, loaned additional money, and Debtor obtained a secured line of credit with People's United Bank for approximately $350,000. In 2014, after deciding that it would only continue lending to Debtor on a secured basis, S&S acquired People's United Bank's line of credit. S&S increased the secured loan limit, first to $4 million, and later to $5.5 million. This tactic allowed S&S to gradually convert its unsecured debt into secured debt.

Debtor failed to improve financially. On July 13, 2015, Debtor's management committee and Stebbins met to discuss Debtor's outstanding debt. At this meeting, S&S and Debtor agreed to the outline of a forbearance agreement, which was memorialized and signed four days later. The forbearance agreement provided for an additional $1.4 million in funding for Debtor on the condition that it file for bankruptcy and sell substantially all of its assets in a section 363 sale. See 11 U.S.C. § 363(b).

Stebbins and Schleicher both stepped down from Debtor's management committee following the July 13 meeting. Thereafter, neither had contact with Debtor's management regarding Debtor's operation or subsequent bankruptcy.

Debtor then engaged Phoenix Capital Resources, a crisis management, investment banking, and financial services firm, to explore its options. Phoenix concluded that Debtor's best route was to be put up for sale. It then solicited approximately five companies to serve as the stalking horse bidder for Debtor's

assets. In the context of a bankruptcy sale, a stalking horse bidder is an initial bidder whose due diligence and research serve to encourage future bidders, and whose bid sets a floor for subsequent bidding. See ASARCO, Inc. v. Elliott Mgmt. (In re ASARCO, L.L.C.), 650 F.3d 593, 602 n.9 (5th Cir. 2011). None of the firms solicited by Phoenix were interested in taking on the expense of this role. In August of 2015, Phoenix approached S&S, which agreed to be the stalking horse bidder.

On September 1, 2015, Debtor filed a petition for Chapter 11 bankruptcy. On the same day, S&S formally became the stalking horse bidder by signing an agreement to purchase Debtor's assets for $6.95 million, composed almost entirely of forgiven pre-petition debt owed by Debtor to S&S. This strategy of offsetting a purchase price with the value of a secured lien is called credit bidding, and it is permitted in a section 363 sale "unless the court for cause orders otherwise." 11 U.S.C. § 363(k). A provision in the Agreement also left Debtor able to back out in favor of a superior bid at the auction.

The next day, Debtor moved for approval of its proposed asset sale procedures. It also moved to reject a number of its executory contracts, including the Mission Agreement. The bankruptcy court ultimately granted that motion, and Mission's challenge to that order is the subject of our separate opinion issued this date in appeal No. 16-9016.

Because the stalking horse bidder -- S&S -- was an insider of Debtor, both the United States Trustee and Mission sought the appointment of an independent examiner to evaluate the proposed sale and bidding procedures. Although Debtor initially resisted, it ultimately concurred in the recommendation. The court agreed, and appointed an examiner.

On October 8, the bankruptcy court held a hearing on the sale motion. In light of a concern raised in the examiner's interim report and echoed by the court about S&S's pre-petition credit bid, S&S agreed at the hearing to change the composition of its stalking horse bid and to lower its value from approximately $7 million to just over $1 million. Its revised bid consisted of $750,000 in post-petition debt and the assumption of about $300,000 in pre-petition liabilities. As the bankruptcy court concluded, this agreement was a concession intended to defer to a later day a possible fight over S&S's credit-bidding rights.

The bankruptcy court approved the sale procedures on October 8, after which Phoenix sent 164 emails to companies that Phoenix determined might be interested in bidding for Debtor's assets. Included with its standard email was a confidentiality agreement and an invitation to visit a data room, in which Phoenix had deposited Debtor's confidential business information. Despite conducting 112 follow-up calls, and a few visits by interested companies to the data room, Phoenix failed to secure any party --

- 7 -

other than Mission and S&S -- willing to bid at the auction. Potential bidders were deterred by, among other things, Debtor's poor financial track record, its dispute with Mission, the size of the market opportunity, and S&S's ability to credit bid. Debtor had also given Phoenix a list of parties not to contact, comprised of Debtor's customers. Debtor believed that these customers would be less likely to continue their relationship with Debtor if they knew that Debtor was undergoing an asset sale, and that their withdrawal would further threaten Debtor's already precarious financial viability.

Through an affiliate, S&S continued to lend to Debtor during the run-up to the auction. S&S included the full amount of this disbursed and imminent loan -- $750,000 -- as post-petition debt in a revised stalking horse bid, submitted at the beginning of October.

On November 2, 2015, Mission placed a qualifying overbid of $1.3 million, entitling the company to bid at auction. Three days later, on November 5, Debtor's counsel held an auction for Debtor's assets, at which S&S and Mission were the only bidders. The bid procedures allowed negotiations to be conducted off the record. Although S&S had revised its stalking horse bid to exclude forgiven pre-petition debt, its first bid at auction -- for a total of $1.4 million -- included such a credit bid. Mission then asserted that S&S had no right to credit bid pre-petition debt,

and announced that it would bid under protest for the remainder of the auction. The next opportunity to bid went to Mission. To beat S&S's proposal, Mission increased the value of its previous bid, to the apparent confusion of some present, by agreeing to leave in the estate $200,000 in cash, thus increasing the total value of its bid to $1.5 million. Bidding continued to proceed in this fashion: S&S increased its bid using credit, and Mission agreed to leave additional assets in the estate, including Debtor's finished goods inventory and accounts receivable. Given Mission's bidding structure, Debtor then revalued its accounts receivable and inventory to reflect their liquidation value as opposed to their book value. This revaluation reduced the bidding value of the accounts receivable by twenty percent, to $80,000, and the bidding value of the inventory by ninety percent, to $120,000. Mission's counsel, after being informed that Debtor would recalculate the inventory value, responded that "[a]s long as it's apples to apples, I don't care." Mission's counsel did not object to the new figures after Debtor announced them.

The parties then broke for lunch. Back on the record, Debtor's counsel informed those present that, after a negotiation between Debtor's counsel and S&S off the record, S&S intended to adopt Mission's bid structure by leaving assets in the estate. In its next bid, S&S credit bid only its post-petition debt, assumed all pre-petition liabilities other than rejection damages and

disputed liabilities, assumed post-petition accounts payable, and left in the estate all accounts receivable, inventory, and cash. In subsequent bidding, S&S increased its bid by credit bidding pre-petition debt, and Mission increased its bid with cash. Mission soon ceased to bid and declined to be designated the backup bidder, ending the auction. S&S's winning bid, for a total value of $2.7 million, consisted of forgiven pre-petition debt, forgiven post-petition debt, the assumption of post-petition accounts payable, the assumption of certain pre-petition unsecured debt, and cash, inventory, and accounts receivable left in the estate. For this consideration, S&S acquired "all of [Debtor's] assets, properties and businesses," excluding, among other things, the assets left in the estate.

Before ruling on Debtor's motion to approve the sale, the bankruptcy court held two days of evidentiary hearings. A Phoenix partner, Debtor's two top officers, and Mark Stebbins of S&S all testified. To support its contention that the sale process was tainted by fraud and collusion, Mission relied on cross-examining Debtor's witnesses, but did not present any witnesses of its own.

At the second day of the hearing, on November 23, 2015, the bankruptcy court noted that it would have an order "very, very quickly." Debtor informed the court that the parties were "ready to close as soon as an order is entered." In its proposed order,

submitted on December 1, Debtor requested that the automatic stay provision of rules 6004(h) and 6006(d) be waived. Debtor had also submitted this request in an earlier draft order. On December 15, 2015, Debtor submitted a status report informing the court that if it could not close the sale by December 18, it would need to draw an additional $150,000 on its post-petition line of credit.

On December 18, 2015, the bankruptcy court posted its order and opinion approving the sale of Debtor's assets to S&S. In re Tempnology, LLC, 542 B.R. 50 (Bankr. D.N.H. 2015). In its analysis, the court looked to whether the sale process provided creditors the same substantive protections as the confirmation process, and also weighed the business reasons for the proposed transaction, including whether it made sense in the overall context of the reorganization. It held that the transaction did not subvert Chapter 11's substantive creditor protections. The court determined that the absolute priority rule was not implicated because "S&S will not retain its equity interest or receive any distribution on account of it, but is instead purchasing the Debtor's assets." Id. at 66. Because an assumption of liabilities "is common practice and there are sound business reasons why some are assumed and others are not," the court ruled that S&S's assumption of liabilities "does not constitute an attempt to circumvent" the Code's prohibition against intra-class

discrimination.  Id.  The court held that S&S was permitted to credit bid under section 363(k).  Id. at 69.

The court further found that "there is no evidence in the record establishing any misconduct or collusion in the sale process by the Debtor and S&S."  Id. at 67.  In doing so, it credited the testimony of Stebbins and Debtor's top officers. Based in part on this finding, the court held that S&S was a "good faith purchaser" within the meaning of section 363(m).  Relying on testimony presented at the November 23 hearing, the court concluded that, whatever their initial relationship, "Stebbins and S&S essentially divorced themselves from the Debtor when it became clear that a reorganization was needed."  Id. at 72.  According to the court, Mission had "failed to demonstrate that the proposed transaction is anything other than an arm's length transaction." Id.  The court also noted that the entire transaction was overseen by both the United States Trustee and an independent examiner, neither of whom lodged any objection to the sale.  Id. at 72.

In its order approving the sale, as Debtor had requested, the bankruptcy court waived the automatic stay in rules 6004(h) and 6006(d).  In doing so, it stated:

> This Court expressly finds and rules that there is no just reason for delay in the implementation of this Order and expressly directs entry of judgment as set forth herein and the stay imposed by Bankruptcy Rules 6004(h) and 6006(d) are hereby waived and this Order shall be effective immediately

> upon its entry and the Debtor is hereby authorized and directed to consummate the sale of the Assets to the Successful Bidder . . . .

Later that day, S&S and Debtor consummated the sale. Mission appealed to the Bankruptcy Appellate Panel for the First Circuit ("BAP").

After the bankruptcy court's order, but prior to the BAP's ruling, Debtor sold its remaining finished goods inventory to S&S, which had left this asset in the estate as part of its winning bid at the auction. On February 25, 2016, Debtor filed a comfort motion seeking approval of the inventory sale. Debtor took the position in its motion that, because "[a]ll of the Debtor's inventory currently consists of branded product," then, "[a]s a result of S&S's acquisition of the Debtor's trademarks and tradenames, the only party who can purchase the branded inventory without violating S&S's intellectual property rights is S&S." Although the initial motion listed the price as seventy-five percent of cost, S&S later raised the price to one-hundred percent of cost.

Mission challenged the inventory sale. On March 22, 2016, the bankruptcy court held a hearing, in which it ultimately approved the sale of the inventory to S&S. It determined the price to be fair and noted that it would be difficult to get a higher price for inventory given that Debtor was in liquidation.

- 13 -

Mission's appeal to the BAP also proved unsuccessful. Mission Prod. Holdings, Inc. v. Old Cold, LLC (In re Old Cold, LLC), 558 B.R. 500 (B.A.P. 1st Cir. 2016). Section 363(m), the BAP held, limited its review to the issue of good faith in the absence of a stay. Id. at 513. Because "[n]othing in the record" persuaded the BAP "that the bankruptcy court's good faith finding was clearly erroneous," it held that section 363(m) barred further review. Id. at 515. The BAP also held that the bankruptcy court applied the correct legal standards and that the post-sale conduct regarding inventory did not upset the good faith finding below. Id. at 520-21.

## II.

We begin our analysis of Mission's arguments on appeal by summarizing the statutory framework. Section 363(b) of the Bankruptcy Code permits a debtor-in-possession,[1] "after notice and a hearing," to "sell . . . property of the estate." 11 U.S.C. § 363(b)(1). In a section 363(b) asset sale, the debtor-in-possession may sell the estate property "free and clear of any interest in such property of an entity." Id. § 363(f). According

---

[1] Although this provision of the statute only refers to the powers of a trustee, per 11 U.S.C. § 1107(a), a Chapter 11 "debtor in possession shall have all the rights . . . and powers, and shall perform all the functions and duties, . . . of a trustee serving in a case under this chapter." See also Mason v. Official Comm. of Unsecured Creditors, for FBI Distrib. Corp. & FBC Distrib. Corp. (In re FBI Distrib. Corp.), 330 F.3d 36, 42 n.8 (1st Cir. 2003) (citing this provision).

- 14 -

to an observer, asset sales have become increasingly common as a substitute for Chapter 11 confirmation plans. See Kimon Korres, Bankrupting Bankruptcy, 63 Fl. L. Rev. 959, 960 (2013). Asset sales provide speed and efficiency to the estate and may maximize the value of the underlying assets by subjecting them to a competitive auction. Id. But, because of a concern that a debtor-in-possession may use an asset sale to circumvent the creditor protections of Chapter 11, section 363(b) does not grant a "carte blanche." Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1069 (2d Cir. 1983). Instead, the bankruptcy court must determine whether there is a "good business reason" for the sale, and whether the sale adheres to the substantive protections of Chapter 11. Id. at 1071.

Should the bankruptcy court approve the sale, the Bankruptcy Code provides a degree of finality to the estate and the purchaser. Section 363(m) provides that:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). The effect of this provision is to render statutorily moot any appellate challenge to a sale that is both to

- 15 -

a good faith purchaser, and not stayed.  See Anheuser-Busch, Inc.
v. Miller (In re Stadium Mgmt. Corp.), 895 F.2d 845, 847 (1st Cir.
1990).

## III.

So, is Mission's appellate challenge to the now-
consummated sale moot?  To establish otherwise, Mission advances
two arguments:  First, it argues that section 363(m) does not
control because S&S was not a good faith purchaser.  Second, it
argues that Mission was given no chance to seek a stay of the sale,
and thus we should overlook the absence of a stay.  We address
each argument in turn.

## A.

Good faith, in the context of section 363(m), is a "mixed
question of law and fact."  Mark Bell Furniture Warehouse, Inc. v.
D.M. Reid Assocs. (In re Mark Bell Furniture Warehouse, Inc.), 992
F.2d 7, 8 (1st Cir. 1993).  On appeal from a decision by the BAP,
"[w]e accord no special deference to determinations made by the
[BAP]," and instead "train the lens of our inquiry directly on the
bankruptcy court's decision."[2]  Wheeling & Lake Erie Ry. Co. v.

---

[2]  We do nevertheless pay great attention to the considered
opinion of the three experienced bankruptcy judges who sit on the
BAP.  Among other things, our consideration of such an opinion
reduces the likelihood that our court of general appellate
jurisdiction is blindsided by the effect that a decision might
have on matters or issues of bankruptcy law and practice that are
beyond the ken of the parties in a particular proceeding.

- 16 -

Keach (In re Montreal, Maine & Atl. Ry., Ltd.), 799 F.3d 1, 5 (1st Cir. 2015).  Mission accepts the proposition that we review the determination of good faith for clear error unless the bankruptcy court's analysis is "infected by legal error."  Prudential Ins. Co. of Am. v. SW Bos. Hotel Venture, LLC (In re SW Bos. Hotel Venture, LLC), 748 F.3d 393, 402 (1st Cir. 2014) (quoting Winthrop Old Farm Nurseries, Inc. v. New Bedford Inst. for Sav. (In re Winthrop Old Farm Nurseries, Inc.), 50 F.3d 72, 73 (1st Cir. 1995)).  Absent legal error, this is a "formidable standard," and we will not reverse if the "bankruptcy court's account of the evidence is plausible in light of the record viewed in its entirety."  Id. (quoting Goat Island S. Condo. Ass'n v. IDC Clambakes, Inc. (In re IDC Clambakes, Inc.), 727 F.3d 58, 64 (1st Cir. 2013)).  Only if "on the whole of the record, we form a strong, unyielding belief that a mistake has been made" will we upset the bankruptcy court's determination under a clear error standard.  Id. (quoting Cumpiano v. Banco Santander P.R., 902 F.2d 148, 152 (1st Cir. 1990)).

Mission argues that the bankruptcy court did indeed commit legal error in finding that S&S was a good faith purchaser. Reasons Mission, because S&S was an insider, the bankruptcy court was required to apply "heightened scrutiny," yet failed to do so. To reject this argument, we need not decide whether heightened security was required.  Rather, we can rest our rejection of

Mission's argument on the fact that the bankruptcy court did bring heightened scrutiny to bear in its relevant findings. It prefaced its findings of fact by expressly stating that it employed a greater level of scrutiny because section 363 "sales to insiders are subject to a higher scrutiny," and observed that, in this context, "higher scrutiny requires a debtor to demonstrate that the assets are being sold for the highest price attainable and that the insider transaction is the result of a bona fide arm's length transaction and not driven by other factors." In re Tempnology, LLC, 542 B.R. at 65 (quotation marks and alterations omitted). The court also applied a "greater level of scrutiny" because of its concern that a sale close "to the heart of the reorganization process" might evade Chapter 11 protections. Id. at 64. Finally, the court expressly rested its finding of good faith upon those findings made under heightened scrutiny. Id. at 72. In sum, there is no basis to claim that the bankruptcy court applied a standard of scrutiny too favorable to Debtor or S&S. We therefore review for clear error.

So the question remains: Did the bankruptcy court commit clear error in finding that S&S is a good faith purchaser within the meaning of section 363(m)? Although the Bankruptcy Code does not define "good faith purchaser," we have defined this phrase in the context of section 363(m) as "one who buys property in good faith and for value, without knowledge of adverse claims." In re

- 18 -

Mark Bell Furniture Warehouse, Inc., 992 F.2d at 8. We address each prong of this three-part definition in turn.

## 1.

First, and true to its name, a good faith purchaser must act "in good faith." Id. This means that the party must purchase without fraud, misconduct, or collusion, and must not take "'grossly unfair' advantage of other bidders." Id. (quoting In re Andy Frain Servs., Inc., 798 F.2d 1113, 1125 (7th Cir. 1986)); see also Oakville Dev. Corp. v. FDIC, 986 F.2d 611, 614 (1st Cir. 1993).

Mission posits that the following alleged events, as Mission characterizes them, evidence collusion or other misconduct: Debtor did not negotiate the forbearance agreement; Stebbins exercised control over Debtor; Debtor instructed Phoenix not to contact certain customers in its marketing efforts; S&S's stalking horse bid included a credit bid of funds not yet disbursed; Debtor and S&S discussed S&S's bid during a break at the auction; and Debtor changed the value of inventory and accounts receivable to their liquidation value at the auction. The bankruptcy court carefully addressed the gist of these allegations. It concluded, based in part on two days of evidentiary hearings, that "there is no evidence in the record establishing any misconduct or collusion in the sale process by the Debtor and S&S." In re Tempnology, LLC, 542 B.R. at 67. The

court found, among other things, that Debtor's marketing efforts were sufficient and appropriate, that Stebbins did not exert influence over Debtor after stepping down from its management committee, that the forbearance agreement and stalking horse bid were negotiated by counsel, that any issue regarding the stalking horse bid's funding was resolved prior to the auction, that S&S was entitled to credit bid at the auction, that the revaluation of the assets at auction applied equally to both bidding parties, that the sale procedures permitted ex parte communication, and, finally, that S&S's bid was superior to Mission's. We see no clear error.

We therefore shift our focus to Mission's alternative argument that information that emerged after the bankruptcy court ruled undercut the basis for its ruling by revealing evidence of collusion during the auction. To briefly recapitulate, both Mission and S&S increased the value of their bids at the auction by leaving the finished goods inventory in the estate, which consisted of branded consumer products ready for sale. After the auction, Debtor sold this inventory to S&S[3] for its book value with approval from the bankruptcy court. Although Debtor took the position that the goods could only be sold to S&S to avoid

---

[3] In its brief and at oral argument, Debtor claimed that it had offered the inventory to Mission, who failed to respond to the offer. Because Debtor does not provide support in the record, we do not consider its assertion.

violating S&S's newly-acquired intellectual property rights, the bankruptcy court "ignore[d]" this theory. It further stated that, if there were such restrictions, it might "prove [Mission's counsel's] point."

Mission seizes on the bankruptcy court's statement to argue that, if faced with the question of good faith again, the bankruptcy court might not hold fast to its prior ruling. Relying on a recent decision from the Ninth Circuit's Bankruptcy Appellate Panel, Mission argues that we can consider post-sale conduct in evaluating the purchaser's good faith. See Hujazi v. Schoenmann (In re Zuercher Tr. of 1999), No. 12-32747, 2016 WL 721485, at *1 (B.A.P. 9th Cir. 2016) (unpublished opinion).

In reviewing Debtor's sale motion, the BAP expressed skepticism about whether it was appropriate for an appellate court to take this tack. Nevertheless, it reviewed Debtor's conduct and concluded that the post-closing sale of inventory did not render the bankruptcy court's finding clearly erroneous.

We share the BAP's reticence to consider post-closing conduct in the first instance. Doing so risks placing an appellate court in the shoes of a trial court and undermines the policy of finality underlying section 363(m). In this particular instance, however, it makes no difference who decides the issue, because we see nothing in the record capable of upsetting the bankruptcy court's determination.

Mission points to two infirmities with Debtor's post-closing sale of inventory. First, Mission argues that the sale to S&S is evidence of a prior secret agreement, thus supporting its allegation of collusion. The record does not support this proposition. Mission, not S&S, introduced the concept of leaving inventory in the estate at the auction. Only after S&S restructured its bid to reflect Mission's strategy did S&S choose to leave inventory in the estate. Further, the examiner concluded, prior to the inventory sale, that S&S was the logical buyer because it had "just acquired a business with potential sales orders and no inventory." Selling the remaining inventory to the most logical buyer at a price the bankruptcy court determined to be fair does not constitute collusion.

Second, Mission argues that the existence of intellectual property restrictions reduced the value of the inventory, thus calling into question the superiority of S&S's bid: If only S&S could purchase the inventory, Mission contends, the market value of the inventory would be decreased. Although it is true that an intellectual property restriction, if it exists, would reduce the market value of the inventory, Mission has offered no counter to the bankruptcy court's apparently apt observation at the motion hearing that such a restriction would have reduced the value of Mission's bid in the same manner, had it prevailed. Therefore, even if a restriction altered the absolute value of the

parties' bids, it did not materially change their relative superiority.

Further, as we read the record, the bankruptcy court's statements do not reflect a hesitance to abide by its prior good faith determination, as Mission contends. When the court stated that a restriction on who might buy the inventory might "prove [Mission's counsel's] point," we read it as referring to the point made by Mission's counsel that a restriction could reduce the value of S&S's bid, not that there is evidence of collusion pointing to bad faith, as Mission now argues. Mission's counsel never made a point about good faith or collusion at the hearing. Adding support to our reading, later in the proceeding, the court again referenced its decision to proceed on the theory that any party could purchase the inventory, and stated that a restriction "could effectively reduce its value to next to nothing" and that the court did not want to make the assumption that "either side" -- meaning S&S or Mission, the two bidders at the auction -- was following this strategy.

Therefore, we agree with the bankruptcy court that S&S acted in good faith, thus satisfying the first requirement of the good faith purchaser test.

**2.**

The second prong of the good faith purchaser definition requires the buyer to have purchased the property "for value."

Greylock Glen Corp. v. Comty. Sav. Bank, 656 F.2d 1, 4 (1st Cir. 1981). If a purchaser buys in good faith at a fairly-conducted auction, paying the auction price is sufficient evidence of having paid value. Licensing by Paolo, Inc. v. Sinatra (In re Gucci), 126 F.3d 380, 390 (2d Cir. 1997). This turns the inquiry primarily back to the issue of good faith, id., which ends our second-prong inquiry because we have already affirmed the bankruptcy court's finding that S&S purchased in good faith.

**3.**

Third, and finally, a good faith purchaser must not have knowledge of adverse claims. Greylock Glen Corp., 656 F.2d at 4. Mission contends that, because S&S knew of Mission's challenge to its right to credit bid, S&S had knowledge of an adverse claim. But a likely appellate challenge to the sale itself is not the type of "adverse claim" that, if known, deprives the purchaser of good faith status. See 11 U.S.C § 363(m) (stating that the statutory protection applies "whether or not [the purchaser] knew of the pendency of the appeal"). Nor does knowledge of an objection to the sale procedures constitute knowledge of an adverse claim. As the Fifth Circuit recently held, there "is a difference . . . between simply having knowledge that there are objections to the transaction and having knowledge of an adverse claim." TMT Procurement Corp. v. Vantage Drilling Co. (In re TMT Procurement Corp.), 764 F.3d 512, 522 (5th Cir. 2014) (per curiam);

see also Shupak v. Dutch Inn of Orlando, Ltd. (In re Dutch Inn of Orlando, Ltd.), 614 F.2d 504, 506 (5th Cir. 1980) (per curiam) ("[M]ere knowledge of the claims . . . that are the basis of this appeal does not deprive [the purchaser] of the protection accorded to a good faith purchaser."). Because Mission does not point to any knowledge that would deprive S&S of the protection of section 363(m), S&S satisfies this third and final prong of the good faith purchaser inquiry.

In sum, for the foregoing reasons, the bankruptcy court did not clearly err in finding S&S to be a good faith purchaser.

## B.

We turn to the second requirement of section 363(m): that the sale be unstayed. It is undisputed that the sale closed in the absence of any stay. Normally, this would end our inquiry. Mission, however, raises an argument based on the interaction between section 363(m) and Bankruptcy Rule 6004(h). The latter rule, in normal course, automatically stays the effect of an order authorizing a sale of the type at issue here. Among other things, this automatic stay creates a window within which an objector might seek a longer stay -- in the bankruptcy court or on an expedited appeal -- in order to preserve the possibility of an appeal. Rule 6004(h), however, also expressly allows the bankruptcy court to waive the automatic stay, which is what the bankruptcy court

did here, allowing the sale to close promptly upon issuance of the order approving the sale.

Mission's argument is not that a bankruptcy court cannot waive the automatic stay. Nor does it argue that such a waiver automatically renders section 363(m)'s bar on appellate review inapplicable. Instead, it argues that the Due Process Clause of the United States Constitution requires that we create an exception to the appellate bar in section 363(m) if the absence of a stay arises from a Rule 6004(h) waiver issued without notice and basis.

Mission advances this argument with scant support or analysis of the embedded due process issues. We need not ourselves dive into such issues because the factual premises upon which Mission rests its argument are incorrect. Debtor repeatedly gave notice -- both in writing and orally -- that it needed to conduct the sale immediately upon approval, and no later than December 18, 2015. On December 1, Debtor submitted its proposed order. This order, like the one it had previously submitted on September 2, requested that the automatic stay be waived. At the November 23 hearing on the motion to approve the sale, Debtor's counsel stated that "I believe we're ready to close as soon as an order is entered."

Debtor also explained why it needed to close on December 18. After the court on November 23 had urged Debtor to avoid obtaining further loans because "it's only going to

complicate things," Debtor submitted a status report informing the court that "[i]n the event the Debtor cannot close a transaction on or before December 18th, it anticipates it will need to draw an additional $150,000 on its post-petition line of credit."  Three days later, on December 18, the bankruptcy court approved the sale and waived the automatic stays on the "express" finding that "there is no just reason for delay."

In short, Mission had notice of the fact that Debtor was seeking a waiver of the stay, and the record made clear the basis for the requested waiver.  Mission's due process argument therefore fails on its own terms.

### c.

As a final shot, Mission argues that Czyzewski v. Jevic Holding Corp., 137 S. Ct. 973 (2017) -- decided by the Supreme Court over a year after the bankruptcy court's order -- controls the outcome of this appeal.  In Jevic, the Supreme Court held that structured dismissals must follow the same priority rules as confirmation plans.  The Court, however, carved out from its ruling interim distributions that further "significant Code-related objectives."  Id. at 985.  Thus, the Court did not call into question the validity of first-day wage orders or critical vendor orders that violate priority rules.  But in a structured dismissal that "does not preserve the debtor as a going concern" and is "attached to a final disposition," the Court concluded that the

violation of ordinary priority rules did not serve "any significant offsetting bankruptcy-related justification." Id. at 986.

Mission argues that Jevic's enforcement of priority rules applies to all end-of-case distributions, including asset sales. As part of its winning bid, S&S agreed to assume approximately $657,000 of Debtor's liabilities. This action, Mission asserts, violates two creditor protections. First, it runs afoul of the prohibition against intra-class discrimination, which requires "the same treatment for each claim or interest of a particular class," 11 U.S.C. § 1123(a)(4), because it provides for payment to creditors of the same class as Mission, without paying Mission's equal priority claim. Second, it violates the absolute priority rule, which prevents a junior claim holder from receiving value before certain senior claim holders are paid in full, see id. § 1129(b)(2)(B)(ii), because it provides for the payment of certain unsecured claims before Mission's administrative claims. Debtor replies, simply, by contending that Jevic -- which, on its face, pertains only to structured dismissals -- does not apply to section 363(b) asset sales, which likely involve potentially "offsetting bankruptcy-related justification[s]" not present in structured dismissals. See Jevic, 137 U.S. at 986.

We need not -- and do not -- consider this challenge to the propriety of the sale. As we have explained, section 363(m)

applies even if the bankruptcy court's approval of the sale was not proper, as long as the bankruptcy court was acting under section 363(b).  In re Stadium Mgmt. Corp., 895 F.2d at 849. Section 363(m) sets forth only two requirements:  that there is a good faith purchaser, and that the sale is unstayed.  Nothing in Jevic appears to add an exception to this statutory text.  Nor does Mission offer any argument that there is such an exception. Rather, it simply asserts -- in one sentence -- that such a purchaser would not be a good faith purchaser.  Mission offers no explanation for why this is so.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").  Certainly the fact that a sale is improper cannot mean ipso facto that there is no good faith purchaser. Otherwise, section 363(m) would not preclude any challenges to the propriety of consummated sales.

## IV.

We conclude that S&S is a good faith purchaser entitled to the protection of section 363(m).  Mission's remaining challenges to the sale order are therefore rendered statutorily moot.  For the foregoing reasons, the bankruptcy court is affirmed. Costs are awarded to appellees/cross-appellants.